## HAGUE, MAYOR, ET AL. *v.* COMMITTEE FOR INDUSTRIAL ORGANIZATION ET AL.

No. 651. Argued February 27, 28, 1939.—Decided June 5, 1939.

*Messrs. Charles Hershenstein* and *Edward J. O'Mara* with whom *Messrs. James A. Hamill* and *John A. Matthews* were on the brief, for petitioners. See p. 661.

*Messrs. Morris L. Ernst* and *Spaulding Frazer,* with whom *Messrs. Lee Pressman* and *Benjamin Kaplan* were on the brief, for respondents. See p. 668.

By leave of Court, the Committee on the Bill of Rights of the American Bar Association, filed a brief, as *amici curiae,* discussing the right of assembly. See p. 678.

MR. JUSTICE BUTLER, presiding in the absence of the CHIEF JUSTICE and MR. JUSTICE McREYNOLDS:

The judgment of the court in this case is that the decree is modified and as modified affirmed. MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS took no part in the consideration or decision of the case. MR. JUSTICE ROBERTS has an opinion in which MR. JUSTICE BLACK concurs, and MR. JUSTICE STONE an opinion in which MR. JUSTICE REED concurs. The CHIEF JUSTICE concurs in an opinion. MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER dissent for reasons stated in opinions by them respectively.

MR. JUSTICE ROBERTS delivered an opinion in which MR. JUSTICE BLACK concurred:

We granted certiorari as the case presents important questions in respect of the asserted privilege and immunity of citizens of the United States to advocate action pursuant to a federal statute, by distribution of printed matter and oral discussion in peaceable assembly; and the jurisdiction of federal courts of suits to restrain the abridgment of such privilege and immunity.

The respondents, individual citizens, unincorporated labor organizations composed of such citizens, and a mem-

bership corporation, brought suit in the United States District Court against the petitioners, the Mayor, the Director of Public Safety, and the Chief of Police of Jersey City, New Jersey, and the Board of Commissioners, the governing body of the city.

The bill alleges that acting under a city ordinance forbidding the leasing of any hall, without a permit from the Chief of Police, for a public meeting at which a speaker shall advocate obstruction of the Government of the United States or a State, or a change of government by other than lawful means, the petitioners, and their subordinates, have denied respondents the right to hold lawful meetings in Jersey City on the ground that they are Communists or Communist organizations; that pursuant to an unlawful plan, the petitioners have caused the eviction from the municipality of persons they considered undesirable because of their labor organization activities, and have announced that they will continue so to do. It further alleges that acting under an ordinance which forbids any person to "distribute or cause to be distributed or strewn about any street or public place any newspapers, paper, periodical, book, magazine, circular, card or pamphlet," the petitioners have discriminated against the respondents by prohibiting and interfering with distribution of leaflets and pamphlets by the respondents while permitting others to distribute similar printed matter, that pursuant to a plan and conspiracy to deny the respondents their Constitutional rights as citizens of the United States, the petitioners have caused respondents, and those acting with them, to be arrested for distributing printed matter in the streets, and have caused them, and their associates, to be carried beyond the limits of the city or to remote places therein, and have compelled them to board ferry boats destined for New York; have, with violence and force, interfered with the distribution of pamphlets discussing the rights of citizens

under the National Labor Relations Act; have unlaw-
fully searched persons coming into the city and seized
printed matter in their possession; have arrested and
prosecuted respondents, and those acting with them, for
attempting to distribute such printed matter; and have
threatened that if respondents attempt to hold public
meetings in the city to discuss rights afforded by the
National Labor Relations Act, they would be arrested;
and unless restrained, the petitioners will continue in
their unlawful conduct. The bill further alleges that
respondents have repeatedly applied for permits to hold
public meetings in the city for the stated purpose, as
required by ordinance,[1] although they do not admit the
validity of the ordinance; but in execution of a common
plan and purpose, the petitioners have consistently re-
fused to issue any permits for meetings to be held by, or
sponsored by, respondents, and have thus prevented the

---

[1] "The Board of Commissioners of Jersey City Do Ordain:

"1. From and after the passage of this ordinance, no public
parades or public assembly in or upon the public streets, highways,
public parks or public buildings of Jersey City shall take place or
be conducted until a permit shall be obtained from the Director
of Public Safety.

"2. The Director of Public Safety is hereby authorized and em-
powered to grant permits for parades and public assembly, upon
application made to him at least three days prior to the proposed
parade or public assembly.

"3. The Director of Public Safety is hereby authorized to refuse
to issue said permit when, after investigation of all of the facts
and circumstances pertinent to said application, he believes it to be
proper to refuse the issuance thereof; provided, however, that said
permit shall only be refused for the purpose of preventing riots, dis-
turbances or disorderly assemblage.

"4. Any person or persons violating any of the provisions of this
ordinance shall upon conviction before a police magistrate of the
City of Jersey City be punished by a fine not exceeding two hundred
dollars or imprisonment in the Hudson County jail for a period not
exceeding ninety days or both."

holding of such meetings; that the respondents did not, and do not, propose to advocate the destruction or overthrow of the Government of the United States, or that of New Jersey, but that their sole purpose is to explain to workingmen the purposes of the National Labor Relations Act, the benefits to be derived from it, and the aid which the Committee for Industrial Organization would furnish workingmen to that end; and all the activities in which they seek to engage in Jersey City were, and are, to be performed peacefully, without intimidation, fraud, violence, or other unlawful methods.

The bill charges that the suit is to redress "the deprivation, under color of state law, statute and ordinance, of rights privileges and immunities secured by the Constitution of the United States and of rights secured by laws of the United States providing for equal rights of citizens of the United States . . ." It charges that the petitioners' conduct "is in violation of their [respondents] rights and privileges as guaranteed by the Constitution of the United States." It alleges that the petitioners' conduct has been "in pursuance of an unlawful conspiracy . . . to injure oppress threaten and intimidate citizens of the United States, including the individual plaintiffs herein, . . . in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States. . . ."

The bill charges that the ordinances are unconstitutional and void, or are being enforced against respondents in an unconstitutional and discriminatory way; and that the petitioners, as officials of the city, purporting to act under the ordinances, have deprived respondents of the privileges of free speech and peaceable assembly secured to them, as citizens of the United States, by the Fourteenth Amendment. It prays an injunction against continuance of petitioners' conduct.

The bill alleges that the cause is of a civil nature, arising under the Constitution and laws of the United States, wherein the amount in controversy exceeds $3,000, exclusive of interest and costs; and is a suit in equity to redress the deprivation, under color of state law, statute and ordinance, of rights, privileges and immunities secured by the Constitution of the United States, and of rights secured by the laws of the United States providing for equal rights of citizens of the United States and of all persons within the jurisdiction of the United States.

The answer denies generally, or qualifies, the allegations of the bill but does not deny that the individual respondents are citizens of the United States; denies that the amount in controversy "as to each plaintiff and against each defendant" exceeds $3,000, exclusive of interest and costs; and alleges that the supposed grounds of federal jurisdiction are frivolous, no facts being alleged sufficient to show that any substantial federal question is involved.

After trial upon the merits the District Court entered findings of fact and conclusions of law and a decree in favor of respondents.[2] In brief, the court found that the purposes of respondents, other than the American Civil Liberties Union, were the organization of unorganized workers into labor unions, causing such unions to exercise the normal and legal functions of labor organizations, such as collective bargaining with respect to the betterment of wages, hours of work and other terms and conditions of employment, and that these purposes were lawful; that the petitioners, acting in their official capacities, have adopted and enforced the deliberate policy of excluding and removing from Jersey City the agents of the respondents; have interfered with their right of passage upon the streets and access to the parks of the city; that these ends have been accomplished by force and violence

---

[2] 25 F. Supp. 127.

despite the fact that the persons affected were acting in an orderly and peaceful manner; that exclusion, removal, personal restraint and interference, by force and violence, are accomplished without authority of law and without promptly bringing the persons taken into custody before a judicial officer for hearing.

The court further found that the petitioners, as officials, acting in reliance on the ordinance dealing with the subject, have adopted and enforced a deliberate policy of preventing the respondents, and their associates, from distributing circulars, leaflets, or handbills in Jersey City; that this has been done by policemen acting forcibly and violently; that the petitioners propose to continue to enforce the policy of such prevention; that the circulars and handbills, distribution of which has been prevented, were not offensive to public morals, and did not advocate unlawful conduct, but were germane to the purposes alleged in the bill, and that their distribution was being carried out in a way consistent with public order and without molestation of individuals or misuse or littering of the streets. Similar findings were made with respect to the prevention of the distribution of placards.

The findings are that the petitioners, as officials, have adopted and enforced a deliberate policy of forbidding the respondents and their associates from communicating their views respecting the National Labor Relations Act to the citizens of Jersey City by holding meetings or assemblies in the open air and at public places; that there is no competent proof that the proposed speakers have ever spoken at an assembly where a breach of the peace occurred or at which any utterances were made which violated the canons of proper discussion or gave occasion for disorder consequent upon what was said; that there is no competent proof that the parks of Jersey City are dedicated to any general purpose other than the recreation of the public and that there is competent proof that the

municipal authorities have granted permits to various persons other than the respondents to speak at meetings in the streets of the city.

The court found that the rights of the respondents, and each of them, interfered with and frustrated by the petitioners, had a value, as to each respondent, in excess of $3,000, exclusive of interest and costs; that the petitioners' enforcement of their policy against the respondents caused the latter irreparable damage; that the respondents have been threatened with manifold and repeated persecution, and manifold and repeated invasions of their rights; and that they have done nothing to disentitle them to equitable relief.

The court concluded that it had jurisdiction under § 24 (1) (12) and (14) of the Judicial Code;[3] that the petitioners' official policy and acts were in violation of the Fourteenth Amendment, and that the respondents had established a cause of action under the Constitution of the United States and under R. S. 1979, R. S. 1980, and R. S. 5508, as amended.[4]

The Circuit Court of Appeals concurred in the findings of fact; held the District Court had jurisdiction under § 24 (1) and (14) of the Judicial Code; modified the decree in respect of one of its provisions, and, as modified, affirmed it.[5]

By their specifications of error, the petitioners limit the issues in this court to three matters. They contend that the court below erred in holding that the District Court had jurisdiction over all or some of the causes of action stated in the bill. Secondly, they assert that the court erred in holding that the street meeting ordinance is unconstitutional on its face, and that it has been un-

[3] 28 U. S. C. § 41 (1), (12) and (14).

[4] 8 U. S. C. §§ 43 and 47 (3), 18 U. S. C. § 51.

[5] *Hague* v. *Committee for Industrial Organization,* 101 F. 2d 774.

constitutionally administered. Thirdly, they claim that the decree must be set aside because it exceeds the court's power and is impracticable of enforcement or of compliance.

*First.* Every question arising under the Constitution may, if properly raised in a state court, come ultimately to this court for decision. Until 1875,[6] save for the limited jurisdiction conferred by the Civil Rights Acts, *infra,* federal courts had no original jurisdiction of actions or suits merely because the matter in controversy arose under the Constitution or laws of the United States; and the jurisdiction then and since conferred upon United States courts has been narrowly limited.

Section 24 of the Judicial Code confers original jurisdiction upon District Courts of the United States. Subsection (1) gives jurisdiction of "suits of a civil nature, at common law or in equity, . . . where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000" and "arises under the Constitution or laws of the United States."

The wrongs of which respondents complain are tortious invasions of alleged civil rights by persons acting under color of state authority. It is true that if the various plaintiffs had brought actions at law for the redress of such wrongs the amount necessary to jurisdiction under § 24 (1) would have been determined by the sum claimed in good faith.[7] But it does not follow that in a suit to restrain threatened invasions of such rights a mere averment of the amount in controversy confers jurisdiction. In suits brought under subsection (1) a traverse of the allegation as to the amount in controversy, or a motion to dismiss based upon the absence of

---

[6] See Act of March 3, 1875, c. 137, 18 Stat. 470.

[7] *Wiley* v. *Sinkler,* 179 U. S. 58; *Swafford* v. *Templeton,* 185 U. S. 487. Compare *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.,* 303 U. S. 283, 288.

such amount, calls for substantial proof on the part of the plaintiff of facts justifying the conclusion that the suit involves the necessary sum.[8] The record here is bare of any showing of the value of the asserted rights to the respondents individually and the suggestion that, in total, they have the requisite value is unavailing, since the plaintiffs may not aggregate their interests in order to attain the amount necessary to give jurisdiction.[9] We conclude that the District Court lacked jurisdiction under § 24 (1).

Section 24 (14) grants jurisdiction of suits "at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States." [10]

The petitioners insist that the rights of which the respondents say they have been deprived are not within those described in subsection (14). The courts below have held that citizens of the United States possess such rights by virtue of their citizenship; that the Fourteenth Amendment secures these rights against invasion by a State, and authorizes legislation by Congress to enforce the Amendment.

---

[8] *McNutt* v. *General Motors Acceptance Corp.,* 298 U. S. 178; compare *KVOS, Inc.* v. *Associated Press,* 299 U. S. 269.

[9] *Wheless* v. *St. Louis,* 180 U. S. 379; *Pinel* v. *Pinel,* 240 U. S. 594, 596; *Scott* v. *Frazier,* 253 U. S. 243.

[10] The section is derived from R. S. 563, § 12, which, in turn, originated in § 3 of the Civil Rights Act of April 9, 1866, 14 Stat. 27, as reënacted by § 18 of the Civil Rights Act of May 31, 1870, 16 Stat. 144, and referred to in § 1 of the Civil Rights Act of April 20, 1871, 17 Stat. 13.

Prior to the Civil War there was confusion and debate as to the relation between United States citizenship and state citizenship. Beyond dispute, citizenship of the United States, as such, existed. The Constitution, in various clauses, recognized it [11] but nowhere defined it. Many thought state citizenship, and that only, created United States citizenship.[12]

After the adoption of the Thirteenth Amendment, a bill, which became the first Civil Rights Act,[13] was introduced in the 39th Congress, the major purpose of which was to secure to the recently freed negroes all the civil rights secured to white men. This act declared that all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, were citizens of the United States and should have the same rights in every State to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property to the same extent as white citizens. None other than citizens of the United States were within the provisions of the Act. It provided that "any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State . . . to the deprivation of any right secured or protected by this act" should be guilty of a misdemeanor. It also conferred on district courts jurisdiction of civil actions by persons deprived of rights secured to them by its terms.

By reason of doubts as to the power to enact the legislation, and because the policy thereby evidenced might be reversed by a subsequent Congress, there was intro-

---

[11] See Art. I, §§ 2 and 3; Art. II, § 1.

[12] See *Scott* v. *Sandford*, 19 How. 393.

[13] Act of April 9, 1866, c. 31, 14 Stat. 27.

duced at the same session an additional amendment to the Constitution which became the Fourteenth.

The first sentence of the Amendment settled the old controversy as to citizenship by providing that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Thenceforward citizenship of the United States became primary and citizenship of a State secondary.[14]

The first section of the Amendment further provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ."

The second Civil Rights Act[15] was passed by the 41st Congress. Its purpose was to enforce the provisions of the Fourteenth Amendment, pursuant to the authority granted Congress by the fifth section of the amendment. By § 18 it reënacted the Civil Rights Act of 1866.

A third Civil Rights Act, adopted April 20, 1871,[16] provided "That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; . . ." This, with changes of the arrangement of clauses which were not intended to alter the scope of the provision, became R. S. 1979, now Title 8, § 43 of the United States Code.

---

[14] *Selective Draft Cases*, 245 U. S. 366, 389.

[15] May 31, 1870, 16 Stat. 140. The act was amended by an Act of February 28, 1871, 16 Stat. 433.

[16] 17 Stat. 13, § 1.

As has been said, prior to the adoption of the Fourteenth Amendment, there had been no constitutional definition of citizenship of-the United States, or of the rights, privileges, and·immunities secured thereby or springing therefrom. The phrase "privileges and immunities" was used in Article IV, § 2 of the Constitution, which decrees that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

At one time it was thought that this section recognized a group of rights which, according to the jurisprudence of the day, were classed as "natural rights"; and that the purpose of the section was to create rights of citizens of the United States by guaranteeing the citizens of every State the recognition of this .group of rights by every other State. Such was the view of Justice Washington.[17]

While this description of the civil rights of the citizens of the States has been quoted with approval,[18] it has come to be the settled view that Article IV, § 2, does not import that a citizen of one State carries with him into another fundamental privileges and immunities ·which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy. The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own.[19]

---

[17] *Corfield* v. *Coryell,* 4 Wash. C. C. 371; 6 Fed. Cas. No. 3230.

[18] *The Slaughter-House Cases,* 16 Wall. 36, 76; *Maxwell* v. *Dow,* 176 U. S. 581, 588, 591; *Canadian Northern Ry. Co.* v. *Eggen,* 252 U. S. 553, 560.

[19] *Downham* v. *Alexandria,* 10 Wall. 173;. *Chambers* v. *Baltimore & Ohio R. Co.,* 207 U. S. 142; *La Tourette* v. *McMaster,* 248 U. S. 465; *Chalker* v. *Birmingham & N. W. Ry. Co.,* 249 U. S. 522;

512

The question now presented is whether freedom to disseminate information concerning the provisions of the National Labor Relations Act, to assemble peaceably for discussion of the Act, and of the opportunities and advantages offered by it, is a privilege or immunity of a citizen of the United States secured against state abridgment [20] by § 1 of the Fourteenth Amendment; and whether R. S. 1979 and § 24 (14) of the Judicial Code afford redress in a federal court for such abridgment. This is the narrow question presented by the record, and we confine our decision to it, without consideration of broader issues which the parties urge. The bill, the answer and the findings fully present the question. The bill alleges, and. the findings sustain the allegation,· that the respondents had no other purpose than to inform citizens of Jersey City by speech, and by the written word, respecting matters growing out of national legislation, the constitutionality of which this court has sustained.

Although it has been held that the Fourteenth Amendment created no rights in citizens of the United States, but merely secured existing rights against state abridgment,[21] it is clear that the right peaceably to assemble and to discuss these topics, and to communicate respecting them, whether orally or in writing, is a privilege inherent in citizenship of the United States which the Amendment protects.

_Shaffer_ v. _Carter_, 252 U. S. 37; _United States_ v. _Wheeler_, 254 U. S. 281; _Douglas_ v. _New York, N. H. & H. R. Co._, 279 U. S. 377; _Whitfield_ v. _Ohio_, 297 U. S. 431.

[20] As to what constitutes state action within the meaning of the amendment, see _Virginia_ v. _Rives_, 100 U S. 313; _Ex parte Virginia_, 100 U. S. 339, 347; _Home Tel. Co._ v. _Los Angeles_, 227 U. S. 278; _Mooney_ v. _Holohan_, 294 U. S. 103, 112; _Lovell_ v. _Griffin_, 303 U. S. 444, 450.

[21] _The Slaughter-House Cases_, 16 Wall. 36, 77; _Minor_ v. _Happersett_, 21 Wall. 162; _Ex parte Virginia_, 100 U. S. 339; _In re Kemmler_, 136 U. S. 436, 448.

In the *Slaughter-House Cases* it was said, 16 Wall. 79: "The right to peaceably assemble and petition for redress of grievances, the privilege of the writ of *habeas corpus*, are rights of the citizen guaranteed by the Federal Constitution."

In *United States* v. *Cruikshank*, 92 U. S. 542, 552–553, the court said:

"The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for any thing else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances. If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States."

No expression of a contrary view has ever been voiced by this court.

The National Labor Relations Act declares the policy of the United States to be to remove obstructions to commerce by encouraging collective bargaining, protecting full freedom of association and self-organization of workers, and, through their representatives, negotiating as to conditions of employment.

Citizenship of the United States would be little better than a name if it did not carry with it the right to discuss national legislation and the benefits, advantages, and opportunities to accrue to citizens therefrom. All of the respondents' proscribed activities had this single end and aim. The District Court had jurisdiction under § 24 (14).

Natural persons, and they alone, are entitled to the privileges and immunities which § 1 of the Fourteenth Amendment secures for "citizens of the United States." [22] Only the individual respondents may, therefore, maintain this suit.

*Second.* What has been said demonstrates that, in the light of the facts found, privileges and immunities of the individual respondents as citizens of the United States, were infringed by the petitioners, by virtue of their official positions, under color of ordinances of Jersey City, unless, as petitioners contend, the city's ownership of streets and parks is as absolute as one's ownership of his home, with consequent power altogether to exclude citizens from the use thereof, or unless, though the city holds the streets in trust for public use, the absolute denial of their use to the respondents is a valid exercise of the police power.

The findings of fact negative the latter assumption. In support of the former the petitioners rely upon *Davis* v. *Massachusetts,* 167 U. S. 43. There it appeared that, pursuant to enabling legislation, the city of Boston adopted an ordinance prohibiting anyone from speaking, discharging fire arms, selling goods, or maintaining any booth for public amusement on any of the public grounds of the city except under a permit from the Mayor. Davis spoke on Boston Common without a permit and without applying to the Mayor for one. He was charged with a violation of the ordinance and moved to quash the complaint, *inter alia,* on the ground that the ordinance abridged his privileges and immunities as a citizen of the United States and denied him due process of law because it was arbitrary and unreasonable. His contentions were overruled and he was convicted. The judgment was

---

[22] *Orient Insurance Co.* v. *Daggs,* 172 U. S. 557; *Holt* v. *Indiana Manufacturing Co.,* 176 U. S. 68; *Western Turf Assn.* v. *Greenberg,* 204 U. S. 359; *Selover, Bates & Co.* v. *Walsh,* 226 U. S. 112.

affirmed by the Supreme Court of Massachusetts and by this court.

The decision seems to be grounded on the holding of the state court that the Common "was absolutely under the control of the legislature," and that it was thus "conclusively determined there was no right in the plaintiff in error to use the common except in such mode and subject to such regulations as the legislature in its wisdom may have deemed proper to prescribe." The Court added that the Fourteenth Amendment did not destroy the power of the States to enact police regulations as to a subject within their control or enable citizens to use public property in defiance of the constitution and laws of the State.

The ordinance there in question apparently had a different purpose from that of the one here challenged, for it was not directed solely at the exercise of the right of speech and assembly, but was addressed as well to other activities, not in the nature of civil rights, which doubtless might be regulated or prohibited as respects their enjoyment in parks. In the instant case the ordinance deals only with the exercise of the right of assembly for the purpose of communicating views entertained by speakers, and is not a general measure to promote the public convenience in the use of the streets or parks.

We have no occasion to determine whether, on the facts disclosed, the *Davis* case was rightly decided, but we cannot agree that it rules the instant case. Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the

streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

We think the court below was right in holding the ordinance quoted in Note 1 void upon its face.[23] It does not make comfort or convenience in the use of streets or parks the standard of official action. It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent "riots, disturbances or disorderly assemblage." It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs, for the prohibition of all speaking will undoubtedly "prevent" such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.

The bill recited that policemen, acting under petitioners' instructions, had searched various persons, including the respondents, and had seized innocent circulars and pamphlets without warrant or probable cause. It prayed injunctive relief against repetition of this conduct. The District Court made no findings of fact concerning such searches and seizures and granted no relief with respect to them. The Circuit Court of Appeals did not enlarge the terms of the decree but found that unreasonable searches and seizures had occurred and that the prohibitions of the Fourth Amendment had been taken over by the Fourteenth so as to protect citizens of the United States against such action.

---

[23] *Lovell* v. *Griffin, supra.* See the construction of the ordinance by the Supreme Court of New Jersey in *Thomas* v. *Casey,* 121 N. J. L. 185; 1 A. 2d 866.

The decree as affirmed by the court below does not restrain any searches or seizures. In each of its provisions addressed to interference with liberty of the person, or to the conspiracy to deport, exclude, and interfere bodily with the respondents in pursuit of their peaceable activities, the decree contains a saving clause of which the following is typical: "except in so far as such personal restraint is in accordance with any right of search and seizure." In the light of this reservation we think there was no occasion for the Circuit Court of Appeals to discuss the question whether exemption from the searches and seizures proscribed by the Fourth Amendment is afforded by the privileges and immunities clause of the Fourteenth, and we have no occasion to consider or decide any such question.

*Third.* It remains to consider the objections to the decree. Section A deals with liberty of the person and prohibits the petitioners from excluding or removing the respondents or persons acting with them from Jersey City, exercising personal restraint over them without warrant or confining them without lawful arrest and production of them for prompt judicial hearing, saving lawful search and seizure; or interfering with their free access to the streets, parks, or public places of the city. The argument is that this section of the decree is so vague in its terms as to be impractical of enforcement or obedience. We agree with the court below that the objection is not well founded.

Section B deals with liberty of the mind. Paragraph 1 enjoins the petitioners from interfering with the right of the respondents, their agents and those acting with them, to communicate their views as individuals to others on the streets in an orderly and peaceable manner. It reserves to the petitioners full liberty to enforce law and order by lawful search and seizure or by arrest and production before a judicial officer. We think this paragraph unassailable.

Paragraphs 2 and 3 enjoin interference with the distribution of circulars, handbills and placards. The decree attempts to formulate the conditions under which respondents and their sympathizers may distribute such literature free of interference. The ordinance absolutely prohibiting such distribution is void under our decision in *Lovell* v. *Griffin, supra,* and petitioners so concede. We think the decree goes too far. All respondents are entitled to is a decree declaring the ordinance void and enjoining the petitioners from enforcing it.

Paragraph 4 has to do with public meetings. Although the court below held the ordinance void, the decree enjoins the petitioners as to the manner in which they shall administer it. There is an initial command that the petitioners shall not place "any previous restraint" upon the respondents in respect of holding meetings, provided they apply for a permit as required by the ordinance. This is followed by an enumeration of the conditions under which a permit may be granted or denied. We think this is wrong. As the ordinance is void, the respondents are entitled to a decree so declaring and an injunction against its enforcement by the petitioners. They are free to hold meetings without a permit and without regard to the terms of the void ordinance. The courts cannot rewrite the ordinance, as the decree, in effect, does.

The bill should be dismissed as to all save the individual plantiffs, and § B, paragraphs 2, 3 and 4 of the decree should be modified as indicated. In other respects the decree should be affirmed.

Mr. Justice Stone:

I do not doubt that the decree below, modified as has been proposed, is rightly affirmed, but I am unable to follow the path by which some of my brethren have attained that end, and I think the matter is of sufficient importance to merit discussion in some detail.

It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, without regard to citizenship, by the due process clause of the Fourteenth Amendment. *Gitlow* v. *New York,* 268 U. S. 652; *Whitney* v. *California,* 274 U. S. 357; *Fiske* v. *Kansas,* 274 U. S. 380; *Stromberg* v. *California,* 283 U. S. 359; *Near* v. *Minnesota,* 283 U. S. 697; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *De Jonge* v. *Oregon,* 299 U. S. 353; *Herndon* v. *Lowry,* 301 U. S. 242; *Lovell* v. *Griffin,* 303 U. S. 444. It has never been held that either is a privilege or immunity peculiar to citizenship of the United States, to which alone the privileges and immunities clause refers, *Slaughter-House Cases,* 16 Wall. 36; *Duncan* v. *Missouri,* 152 U. S. 377, 382; *Twining* v. *New Jersey,* 211 U. S. 78, 97; *Maxwell* v. *Bugbee,* 250 U. S. 525, 538; *Hamilton* v. *Regents,* 293 U. S. 245, 261, and neither can be brought within the protection of that clause without enlarging the category of privileges and immunities of United States citizenship as it has hitherto been defined.

As will presently appear, the right to maintain a suit in equity to restrain state officers, acting under a state law, from infringing the rights of freedom of speech and of assembly guaranteed by the due process clause, is given by Act of Congress to every person within the jurisdiction of the United States whether a citizen or not, and such a suit may be maintained in the district court without allegation or proof that the jurisdictional amount required by § 24 (1) of the Judicial Code is involved. Hence there is no occasion, for jurisdictional purposes or any other, to consider whether freedom of speech and of assembly are immunities secured by the privileges and immunities clause of the Fourteenth Amendment to citizens of the United States, or to revive the contention,

rejected by this Court in the *Slaughter-House Cases,* *supra,* that the privileges and immunities of United States citizenship, protected by that clause, extend beyond those which arise or grow out of the relationship of United States citizens to the national government.[1]

[1] The privilege or immunity asserted in the *Slaughter-House Cases* was the freedom to pursue a common business or calling, alleged to have been infringed by a state monopoly statute. It should not be forgotten that the Court, in deciding the case, did not deny the contention of the dissenting justices that the asserted freedom was in fact infringed by the state law. It rested its decision rather on the ground that the immunity claimed was not one belonging to persons by virtue of their citizenship. "It is quite clear," the Court declared (p. 74), "that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend on different characteristics in the individual." And it held that the protection of the privileges and immunities clause did not extend to those "fundamental" rights attached to state citizenship which are peculiarly the creation and concern of state governments and which Mr. Justice Washington, in *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 6 Fed. Cas. No. 3230, mistakenly thought to be guaranteed by Article IV, § 2 of the Constitution. The privileges and immunities of citizens of the United States, it was pointed out, are confined to that limited class of interests growing out of the relationship between the citizen and the national government created by the Constitution and federal laws. *Slaughter-House Cases,* 16 Wall. 36, 79; see *Twining* v. *New Jersey,* 211 U. S. 78, 97, 98.

That limitation upon the operation of the privileges and immunities clause has not been relaxed by any later decisions of this Court. *In re Kemmler,* 136 U. S. 436, 448; *McPherson* v. *Blacker,* 146 U. S. 1, 38; *Giozza* v. *Tiernan,* 148 U. S. 657, 661; *Duncan* v. *Missouri,* 152 U. S. 377, 382. Upon that ground appeals to this Court to extend the clause beyond the limitation have uniformly been rejected, and even those basic privileges and immunities secured against federal infringement by the first eight amendments have uniformly been held not to be protected from state action by the privileges and immunities clause. *Walker* v. *Sauvinet,* 92 U. S. 90; *Hurtado* v. *California,* 110 U. S. 516; *Presser* v. *Illinois,* 116 U. S. 252; *O'Neill* v. *Vermont,* 144 U. S. 323; *Maxwell* v. *Dow,* 176

That such is the limited application of the privileges and immunities clause seems now to be conceded by my brethren. But it is said that the freedom of respondents with which the petitioners have interfered is the "freedom to disseminate information concerning the provisions of the National Labor Relations Act, to assemble peace-

U. S. 581; *West* v. *Louisiana,* 194 U. S. 258; *Twining* v. *New Jersey, supra; Palko* v. *Connecticut,* 302 U. S. 319.

The reason for this narrow construction of the clause and the consistently exhibited reluctance of this Court to enlarge its scope has been well understood since the decision of the *Slaughter-House Cases.* If its restraint upon state action were to be extended more than is needful to protect relationships between the citizen and the national government, and if it were to be deemed to extend to those fundamental rights of person and property attached to citizenship by the common law and enactments of the states when the Amendment was adopted, such as were described in *Corfield* v. *Coryell, supra,* it would enlarge Congressional and judicial control of state action and multiply restrictions upon it whose nature, though difficult to anticipate with precision, would be of sufficient gravity to cause serious apprehension for the rightful independence of local government. That was the issue fought out in the *Slaughter-House Cases,* with the decision against enlargement.

Of the fifty or more cases which have been brought to this Court since the adoption of the Fourteenth Amendment in which state statutes have been assailed as violating the privileges and immunities clause, in only a single case was a statute held to infringe a privilege or immunity peculiar to citizenship of the United States. In that one, *Colgate* v. *Harvey,* 296 U. S. 404, it was thought necessary to support the decision by pointing to the specific reference in the *Slaughter-House Cases, supra,* 79, to the right to pass freely from state to state, sustained as a right of national citizenship in *Crandall* v. *Nevada,* 6 Wall. 35, before the adoption of the Amendment.

The cases will be found collected in Footnote 2 of the dissenting opinion in *Colgate* v. *Harvey,* 296 U. S. 404, 445. To these should be added *Holden* v. *Hardy,* 169 U. S. 366; *Ferry* v. *Spokane, P. & S. R. Co.,* 258 U. S. 314; *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S. 63; *Whitfield* v. *Ohio,* 297 U. S. 431; *Breedlove* v. *Suttles,* 302 U. S. 277; *Palko* v. *Connecticut,* 302 U. S. 319.

ably for discussion of the Act, and of the opportunities and advantages offered by it," and that these are privileges and immunities of citizens of the United States secured against state abridgment by the privileges and immunities clause of the Fourteenth Amendment. It has been said that the right of citizens to assemble for the purpose of petitioning Congress for the redress of grievances is a privilege of United States citizenship protected by the privileges and immunities clause. *United States v. Cruikshank,* 92 U. S. 542, 552-553. We may assume for present purposes, although the step is a long and by no means certain one, see *Maxwell v. Dow,* 176 U. S. 581; *Twining v. New Jersey, supra,* that the right to assemble to discuss the advantages of the National Labor Relations Act is likewise a privilege secured by the privileges and immunities clause to citizens of the United States, but not to others, while freedom to assemble for the purpose of discussing a similar state statute would not be within the privileges and immunities clause. But the difficulty with this assumption is, as the record and briefs show, that it is an afterthought first emerging in this case after it was submitted to us for decision, and like most afterthoughts in litigated matters it is without adequate support in the record.

The respondents in their bill of complaint specifically named and quoted Article IV, § 2, now conceded to be inapplicable, and the due process and equal protection clauses of the Fourteenth Amendment as the provisions of the Constitution which secure to them the rights of free speech and assembly. They omitted the privileges and immunities clause of the Fourteenth Amendment from their quotation. They made no specific allegation that any of those whose freedom had been interfered with by petitioners was a citizen of the United States. The general allegation that the acts of petitioners complained of violate the rights of "citizens of the United States, in-

cluding the individual plaintiffs here," and other allegations of like tenor, were denied by petitioners' answer. There is no finding by either court below that any of respondents or any of those whose freedom of speech and assembly has been infringed are citizens of the United States, and we are referred to no part of the evidence in which their citizenship is mentioned or from which it can be inferred.

Both courts below found, and the evidence supports the findings, that the purpose of respondents, other than the Civil Liberties Union, in holding meetings in Jersey City, was to organize labor unions in various industries in order to secure to workers the benefits of collective bargaining with respect to betterment of wages, hours of work and other terms and conditions of employment. Whether the proposed unions were to be organized in industries which might be subject to the National Labor Relations Act or to the jurisdiction of the National Labor Relations Board does not appear. Neither court below has made any finding that the meetings were called to discuss, or that they ever did in fact discuss, the National Labor Relations Act. The findings do not support the conclusion that the proposed meetings involved any such relationship between the national government and respondents or any of them, assuming they are citizens of the United States, as to show that the asserted right or privilege was that of a citizen of the United States, and I cannot say that an adequate basis has been laid for supporting a theory—which respondents themselves evidently did not entertain—that any of their privileges as citizens of the United States, guaranteed by the Fourteenth Amendment, were abridged, as distinguished from the privileges guaranteed to all persons by the due process clause. True, the findings refer to the suppression by petitioners of exhibits, one of which turns out to be a handbill advising workers they have the legal right, under

the Wagner Act, to choose their own labor union to represent them in collective bargaining. But the injunction, which the Court now rightly sustains, is not restricted to the protection of the right, said to pertain to United States citizenship, to disseminate information about the Wagner Act. On the contrary it extends and applies in the broadest terms to interferences with respondents in holding any lawful meeting and disseminating any lawful information by circular, leaflet, handbill and placard. If, as my brethren think, respondents are entitled to maintain in this suit only the rights secured to them by the privileges and immunities clause of the Fourteenth Amendment—here the right to disseminate information about the National Labor Relations Act—it is plain that the decree is too broad. Instead of enjoining, as it does, interferences with all meetings for all purposes and the lawful dissemination of all information, it should have confined its restraint to interferences with the dissemination of information about the National Labor Relations Act, through meetings or otherwise. The court below rightly omitted any such limitation from the decree, evidently because, as it declared, petitioners' acts infringed the due process clause, which guarantees to all persons freedom of speech and of assembly for any lawful purpose.

No more grave and important issue can be brought to this Court than that of freedom of speech and assembly, which the due process clause guarantees to all persons regardless of their citizenship, but which the privileges and immunities clause secures only to citizens, and then only to the limited extent that their relationship to the national government is affected. I am unable to rest decision here on the assertion, which I think the record fails to support, that respondents must depend upon their limited privileges as citizens of the United States in order to sustain their cause, or upon so palpable an avoidance

of the real issue in the case, which respondents have raised by their pleadings and sustained by their proof. That issue is whether the present proceeding can be maintained under § 24 (14) of the Judicial Code as a suit for the protection of rights and privileges guaranteed by the due process clause. I think respondents' right to maintain it does not depend on their citizenship and cannot rightly be made to turn on the existence or non-existence of a purpose to disseminate information about the National Labor Relations Act. It is enough that petitioners have prevented respondents from holding meetings and disseminating information whether for the organization of labor unions or for any other lawful purpose.

If it be the part of wisdom to avoid unnecessary decision of constitutional questions, it would seem to be equally so to avoid the unnecessary creation of novel constitutional doctrine, inadequately supported by the record, in order to attain an end easily and certainly reached by following the beaten paths of constitutional decision.

The right to maintain the present suit is conferred upon the individual respondents by the due process clause and Acts of Congress, regardless of their citizenship and of the amount in controversy. Section 1 of the Civil Rights Act of April 20, 1871, 17 Stat. 13, provided that "any person who, under color of any law, statute, ordinance . . . of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress." And it directed that such proceedings should be prosecuted in the several district or circuit courts of the United States. The right of action given by this section was later specifically limited to "any citizen of the United States or other person within the jurisdiction thereof," and was

extended to include rights, privileges and immunities secured by the laws of the United States as well as by the Constitution. As thus modified the provision was continued as § 1979 of the Revised Statutes and now constitutes § 43 of Title 8 of the United States Code. It will be observed that the cause of action, given by the section in its original as well as its final form, extends broadly to deprivation by state action of the rights, privileges and immunities secured to persons by the Constitution. It thus includes the Fourteenth Amendment and such privileges and immunities as are secured by the due process and equal protection clauses, as well as by the privileges and immunities clause of that Amendment. It will also be observed that they are those rights secured to persons, whether citizens of the United States or not, to whom the Amendment in terms extends the benefit of the due process and equal protection clauses.

Following the decision of the *Slaughter-House Cases* and before the later expansion by judicial decision of the content of the due process and equal protection clauses, there was little scope for the operation of this statute under the Fourteenth Amendment. The observation of the Court in *United States v. Cruikshank*, 92 U. S. 542, 551, that the right of assembly was not secured against state action by the Constitution, must be attributed to the decision in the *Slaughter-House Cases* that only privileges and immunities peculiar to United States citizenship were secured by the privileges and immunities clause, and to the further fact that at that time it had not been decided that the right was one protected by the due process clause. The argument that the phrase in the statute "secured by the Constitution" refers to rights "created," rather than "protected" by it, is not persuasive. The preamble of the Constitution, proclaiming the establishment of the Constitution in order to "secure the

Blessings of Liberty," uses the word "secure" in the sense of "protect" or "make certain." That the phrase was used in this sense in the statute now under consideration was recognized in *Carter* v. *Greenhow,* 114 U. S. 317, 322, where it was held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the "right secured to him by that clause of the Constitution" [the contract clause], to which he had "chosen not to resort." See, as to other rights protected by the Constitution and hence secured by it, brought within the provisions of R. S. § 5508, *Logan* v. *United States,* 144 U. S. 263; *In re Quarles and Butler,* 158 U. S. 532; *United States* v. *Mosley,* 238 U. S. 383.

Since freedom of speech and freedom of assembly are rights secured to persons by the due process clause, all of the individual respondents are plainly authorized by § 1 of the Civil Rights Act of 1871 to maintain the present suit in equity to restrain infringement of their rights. As to the American Civil Liberties Union, which is a corporation, it cannot be said to be deprived of the civil rights of freedom of speech and of assembly, for the liberty guaranteed by the due process clause is the liberty of natural, not artificial, persons. *Northwestern Life Ins. Co.* v. *Riggs,* 203 U. S. 243, 255; *Western Turf Assn.* v. *Greenberg,* 204 U. S. 359, 363.

The question remains whether there was jurisdiction in the district court to entertain the suit although the matter in controversy cannot be shown to exceed $3,000 in value because the asserted rights, freedom of speech and freedom of assembly, are of such a nature as not to be susceptible of valuation in money. The question is the same whether the right or privilege asserted is secured by the privileges and immunities clause or any other. When the Civil Rights Act of 1871 directed that suits for violation of § 1 of that Act should be prosecuted

in the district and circuit courts, the only requirement of a jurisdictional amount in suits brought in the federal courts was that imposed by § 11 of the Judiciary Act of 1789, which conferred jurisdiction on the circuit courts of suits where "the matter in dispute" exceeded $500 and the United States was a plaintiff, or an alien was a party, or the suit was between citizens of different states; and it was then plain that the requirement of a jurisdictional amount did not extend to the causes of action authorized by the Civil Rights Act of 1871. By the Act of March 3, 1875, c. 137, 18 Stat. 470, the jurisdiction of the circuit courts was extended to suits at common law or in equity "arising under the Constitution or laws of the United States" in which the matter in dispute exceeded $500. By the Act of March 3, 1911, c. 231, 36 Stat. 1087, the circuit courts were abolished and their jurisdiction was transferred to the district courts, and by successive enactments the jurisdictional amount applicable to certain classes of suits was raised to $3,000. The provisions applicable to such suits, thus modified, appear as § 24 (1) of the Judicial Code, 28 U. S. C. § 41 (1).

Meanwhile, the provisions conferring jurisdiction on district and circuit courts over suits brought under § 1 of the Civil Rights Act of 1871 were continued as R. S. §§ 563 and 629, and now appear as § 24 (14) of the Judicial Code, 28 U. S. C. § 41 (14). The Act of March 3, 1911, 36 Stat. 1087, 1091, amended § 24 (1) of the Judicial Code so as to direct that "The foregoing provision as to the sum or value of the matter in controversy shall not be construed to apply to any of the cases mentioned in the succeeding paragraphs of this section."[2] Thus,

---

[2] This provision made no change in existing law but was inserted for the purpose of removing all doubt upon the point. See H. R. Rep. No. 783, Part 1, 61st Cong., 2d Sess., p. 15; Sen. Rep. No. 388, Part 1, 61st Cong., 2d Sess., p. 11. Cf. *Miller-Magee Co.* v. *Carpenter,* 34 F. 433; *Ames* v. *Hager,* 36 F. 129.

since 1875, the jurisdictional acts have contained two parallel provisions, one conferring jurisdiction on the federal courts, district or circuit, to entertain suits "arising under the Constitution or laws of the United States" in which the amount in controversy exceeds a specified value; the other, now § 24 (14) of the Judicial Code, conferring jurisdiction on those courts of suits authorized by the Civil Rights Act of 1871, regardless of the amount in controversy.

Since all of the suits thus authorized are suits arising under a statute of the United States to redress deprivation of rights, privileges and immunities secured by the Constitution, all are literally suits "arising under the Constitution or laws of the United States." But it does not follow that in every such suit the plaintiff is required by § 24 (1) of the Judicial Code to allege and prove that the constitutional immunity which he seeks to vindicate has a value in excess of $3,000. There are many rights and immunities secured by the Constitution, of which freedom of speech and assembly are conspicuous examples, which are not capable of money valuation, and in many instances, like the present, no suit in equity could be maintained for their protection if proof of the jurisdictional amount were prerequisite. We can hardly suppose that Congress, having in the broad terms of the Civil Rights Act of 1871 vested in all persons within the jurisdiction of the United States a right of action in equity for the deprivation of constitutional immunities, cognizable only in the federal courts, intended by the Act of 1875 to destroy those rights of action by withholding from the courts of the United States jurisdiction to entertain them.

That such was not the purpose of the Act of 1875 in extending the jurisdiction of federal courts to causes of action arising under the Constitution or laws of the United States involving a specified jurisdictional amount, is evident from the continuance upon the statute books of

§ 24 (14) side by side with § 24 (1) of the Judicial Code, as amended by the Act of 1875. Since the two provisions stand and must be read together, it is obvious that neither is to be interpreted. as abolishing the other, especially when it is remembered that the 1911 amendment of § 24 (1) provided that the requirement of a jurisdictional amount should not be construed. to apply to cases mentioned in § 24 (14). This must be taken as legislative recognition that there are suits authorized by § 1 of the Act of 1871 which could be brought under § 24 (14) after, as well as before, the amendment of 1875 without compliance with any requirement of jurisdictional amount, and that these at least must be deemed to include suits in which the subject matter is one incapable of valuation. Otherwise we should be forced to reach the absurd conclusion that § 24 (14) is meaningless and that a large proportion of the suits authorized by the Civil Rights Act cannot be maintained in any court, although jurisdiction of them, with no requirement of jurisdictional amount, was carefully preserved by § 24 (14) of the Judicial Code and by the 1911 amendment of § 24 (1). By treating § 24 (14) as conferring federal jurisdiction of suits brought under the Act of 1871 in which the right asserted is inherently incapable of pecuniary valuation, we harmonize the two parallel provisions of the Judicial Code, construe neither as superfluous, and give to each a scope in conformity with its history and manifest purpose.

The practical construction which has been given by this Court to the two jurisdictional provisions establishes that the jurisdiction conferred by § 24 (14) has been preserved to the extent indicated. In *Holt* v. *Indiana Mfg. Co.,* 176 U. S. 68, suit was brought to restrain alleged unconstitutional taxation of patent rights. The Court held that the suit was one arising under the Constitution or laws of the United States within the meaning of § 24 (1) of the Judicial Code and that the United States Circuit Court

in which the suit had been begun was without jurisdiction because the challenged tax was less than the jurisdictional amount. The Court remarked that the present § 24 (14) applied only to suits alleging deprivation of "civil rights." On the other hand, in *Truax* v. *Raich,* 239 U. S. 33, aff'g 219 F. 273, this Court sustained the jurisdiction of a district court to entertain the suit of an alien to restrain enforcement of a state statute alleged to be an infringement of the equal protection clause of the Fourteenth Amendment because it discriminated against aliens in their right to seek and retain employment. The jurisdiction of a district court was similarly sustained in *Crane* v. *Johnson,* 242 U. S. 339, on the authority of *Truax* v. *Raich, supra.* The suit was brought in a district court to restrain enforcement of a state statute alleged to deny equal protection in suppressing the freedom to pursue a particular trade or calling. For the purposes of the present case it is important to note that the constitutional right or immunity alleged in these two cases was one of personal freedom, invoked in the *Raich* case by one not a citizen of the United States. In both cases the right asserted arose under the equal protection, not the privileges and immunities clause; in both the gist of the cause of action was not damage or injury to property, but unconstitutional infringement of a right of personal liberty not susceptible of valuation in money. The jurisdiction was sustained despite the omission of any allegation or proof of jurisdictional amount, pointedly brought to the attention of this Court.

The conclusion seems inescapable that the right conferred by the Act of 1871 to maintain a suit in equity in the federal courts to protect the suitor against a deprivation of rights or immunities secured by the Constitution, has been preserved; and that whenever the right or immunity is one of personal liberty, not dependent for its existence upon the infringement of property rights, there

is jurisdiction in the district court under § 24 (14) of the Judicial Code to entertain it without proof that the amount in controversy exceeds $3,000. As the right is secured to "any person" by the due process clause, and as the statute permits the suit to be brought by "any person" as well as by a citizen, it is certain that resort to the privileges and immunities clause would not support the decree which we now sustain and would involve constitutional experimentation as gratuitous as it is unwarranted. We cannot be sure that its consequences would not be unfortunate.

MR. CHIEF JUSTICE HUGHES, concurring:

With respect to the merits I agree with the opinion of MR. JUSTICE ROBERTS and in the affirmance of the judgment as modified. With respect to the point as to jurisdiction I agree with what is said in the opinion of MR. JUSTICE ROBERTS as to the right to discuss the National Labor Relations Act being a privilege of a citizen of the United States, but I am not satisfied that the record adequately supports the resting of jurisdiction upon that ground. As to that matter, I concur in the opinion of MR. JUSTICE STONE.

MR. JUSTICE McREYNOLDS, dissenting:

I am of opinion that the decree of the Circuit Court of Appeals should be reversed and the cause remanded to the District Court with instructions to dismiss the bill. In the circumstances disclosed, I conclude that the District Court should have refused to interfere by injunction with the essential rights of the municipality to control its own parks and streets. Wise management of such intimate local affairs, generally at least, is beyond the competency of federal courts, and essays in that direction should be avoided.

There was ample opportunity for respondents to assert their claims through an orderly proceeding in courts of the state empowered authoritatively to interpret her laws with final review here in respect of federal questions.

MR. JUSTICE BUTLER, dissenting:

I am of opinion that the challenged ordinance is not void on its face; that in principle it does not differ from the Boston ordinance, as applied and upheld by this Court, speaking through Mr. Justice White, in *Davis* v. *Massachusetts*, 167 U. S. 43, affirming the Supreme Judicial Court of Massachusetts, speaking through Mr. Justice Holmes, in *Commonwealth* v. *Davis*, 162 Mass. 510; 39 N. E. 113, and that the decree of the Circuit Court of Appeals should be reversed.