THE BOROUGH OF DUMONT, PLAINTIFF v. BRIAN CA-
RUTH, PAMELA FILIPOWICZ AND JAMES ALIMENA,
DEFENDANTS.

Municipal Court,
Borough of Dumont.

Decided March 6, 1973.

*Mr. Emil S. Cuccio,* Acting Borough Prosecutor, for the Borough of Dumont; (*Messrs. Calissi, Klinger, Cuccio and Baldino,* attorneys) ; *Mr. Emil S. Cuccio* on the brief.

*Mr. Vincent McCarthy,* for defendants Brian Caruth, Pamela Filipowicz and James Alimena; (*Bergen County Legal Services Assurance Corporation,* attorneys) ; *Mr. Vincent McCarthy* on the brief.

PASHMAN, A. J. S. C., Temporarily Assigned. Defendants were charged by the Borough of Dumont with violating Ordinance #536, Chapter 2–31, in that they were present on June 6, 1972 at 11:06 P.M. in a Borough park located at 15 New Street in Dumont after the 11:00 P.M. curfew.

The ordinance in question adopted rules and regulations regarding the use of Borough parks and the facilities therein. One of the regulations provides that "[n]o person may remain, stay or loiter in a park between the hours of 11 o'clock P.M. and sunrise." The foregoing facts have been stipulated.

In challenging the validity of this ordinance, the defendants, while framing their argument in somewhat more elaborate terms, are in essence claiming that:

(1) the ordinance constitutes an unreasonable exercise of the police power in that there is no statutory authority for the imposition of the curfew and that there is

no necessity to justify its imposition under the general police power, and

(2) even if there is authority for the Borough to enact such an ordinance, the imposition of the curfew is done in such a way as to allow for arbitrary enforcement and abuse of police power so that the ordinance must be stricken as vague and overbroad in that it allows punishment of innocent conduct.

To counter these arguments, Dumont claims that *N. J. S. A.* 40:12–6 explicitly grants municipalities the right to enact regulations governing the use of parks and playgrounds and that this statute authorizes the imposition of the curfew in question. It contends that because of this legislative authorization, the standards governing the validity of a general curfew do not apply and municipalities are to be allowed greater latitude in regulating the use of parks than in the case of public streets and sidewalks in general. In addition, it contends that the ordinance and its adopted regulations, taken as a whole, establish a valid constitutional purpose and set forth reasonable constitutional standards for enforcement which do not allow unconstitutional arbitrary enforcement.

We turn first to the question of whether the municipality is empowered either by specific statutory grant or by the general police power to impose a curfew in its parks.

The general power of municipalities to act for the welfare of their inhabitants derives from two main sources other than the specific grants of authority in *N. J. S. A.* 40:48–1. It derives from specific grants of authority contained in many statutes in which municipalities are directed or advised to carry out the will of the Legislature in specific instances and it derives from *N. J. S. A.* 40:48–2, which provides as follows:

Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and

property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

The regulation in question was adopted by the Dumont Recreation Commission pursuant to Ordinance #2–31, which is enacted under authority of, and is substantially similar in wording to, *N. J. S. A.* 40:12–6, which follows:

"The board of recreation commissioners shall have full control over all lands, playgrounds and recreation places acquired or leased under the provisions of sections 40:12–1 to 40:12–9 of this title [pertaining to the establishment and powers of boards of recreation commissioners over parks and playgrounds] and may adopt suitable rules, regulations and by-laws for the use thereof, and the conduct of all persons while on or using the same; and any person who shall violate any of such rules, regulations or by-laws shall be deemed and adjudged to be a disorderly person. . . ."

██ I agree with Dumont's contention that the Legislature's use of the word "and" between the phrases "may adopt . . . rules . . . for the use thereof" and "the conduct of all persons while on or using the same" indicates a desire to invest authority to regulate more than the mere deportment of persons using public parks. The Legislature clearly intended to allow the municipalities, through their boards of recreation commissioners, to regulate the "use" of parks *as well as* conduct while using them.

██ ██ The municipality contends that the word "use" means that it is empowered to determine whether and *when* the parks can be used at all, rather than merely the uses to which the parks may be put. I agree. A survey of the cases dealing with the power of municipalities over public facilities in general bears out this conclusion. A municipality holds public property in trust for the public, but there is no requirement that such property must be made available for public use at all times. It is entirely reasonable, and I am sure that this is what the Legislature intended by wording the statute as it did, that in the interest of public safety

and welfare a municipality may close a park during certain hours of the night just as it may close public buildings. Surely the Legislature did not intend that municipalities are required to hold open all public facilities for public use 24 hours a day.

The United States Supreme Court has addressed this subject in a case arising from New Jersey, *Hague v. Committee for Industrial Organization*, 307 *U. S.* 496, 59 *S. Ct.* 954, 83 *L. Ed.* 1423 (1939). The court modified and affirmed a decree declaring unconstitutional a Jersey City ordinance which required a permit to be issued by the Chief of Police for the leasing of a hall for any public meeting at which the speaker advocated various "subversive" positions. The court ruled, as had the United States Court of Appeals for the Third Circuit, 101 *F. 2d* 774 (3d Cir. 1939), modifying *Committee for Industrial Organization v. Hague*, 25 *F. Supp.* 127 (D. N. J. 1938), that the ordinance unconstitutionally permitted uncontrolled suppression by public officials of freedom of expression of views. In making this determination, the court, by Mr. Justice Roberts, made the following observations regarding the right of municipalities to control the use of public facilities:

. . . Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is *not absolute, but relative*, and must be exercised *in subordination to the general comfort and convenience*, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied. 307 *U. S.* 496, 59 *S. Ct.* at 964. (Emphasis added).

The court concluded that the ordinance in question was invalid because this notion of comfort and convenience of

the public was not its basis, but rather, it was premised on the desire of public officials to curtail dissident assembly and expression of views unpopular with the local regime. Thus the court was careful to distinguish between cases such as that before it and cases involving the legitimate interest of the public in limiting the "privilege" of using public facilities. Indeed, the court distinguished the case of *Davis v. Massachusetts,* 167 *U. S.* 43, 17 *S. Ct.* 731, 42 *L. Ed.* 71 (1897), in which a Boston ordinance limiting the use of the Boston Common for various purposes without a permit from the mayor was upheld as a reasonable exercise of the police power, in view of the fact that the State had the authority to prohibit the use of the park altogether.

Thus, our highest court has determined that a municipality *can* limit the use of public facilities, including parks, but that it cannot do so arbitrarily. I read the *Hague* case to this effect, and I think that in a practical sense the conclusion is inescapable that a municipality need not maintain public facilities open for public use 24 hours a day. The court stated that the right of private citizens to use public facilities is relative, not absolute, and it can be subordinated "to the general comfort and convenience, and in consonance with peace and good order." *Hague, supra,* 307 *U. S.* 496, 59 *S. Ct.* at 964.

██ But in connection with the notion that any such restriction must not be arbitrarily imposed, it is necessary to examine the cases in New Jersey dealing with the power of a municipality to restrict freedom of movement on public streets generally, as opposed to limitations covering only parks. It should be borne in mind that a municipality's control over the use of specific public property such as a park, is arguably at least, greater than that regarding the public streets and sidewalks in general. This observation goes to the issue of when a curfew may be imposed (*i. e.,* under what circumstances). Thus, it is reasonable to conclude, as Dumont does, that higher standards must be im-

posed to justify a general curfew than those necessary to justify the closing of a park.

However, regardless of the circumstances, even if we assume *arguendo* that the imposition of a curfew is justified, no such restriction can be upheld unless it meets constitutional standards of fairness in its enforcement. Such was the holding of *Camarco v. City of Orange*, 61 *N. J.* 463 (1972), which affirmed the opinion below, 116 *N. J. Super.* 531 (App. Div. 1971). In upholding an ordinance of the City of Orange prohibiting loitering under certain conditions, the Appellate Division construed the ordinance to hold that as a condition to making illegal any of the described "conduct" [if loitering can be considered "conduct"], a warning to the offending party to move on had to be given by the police officer and not heeded by the offender. It based its decision on what was then the leading New Jersey case on the subject, *State v. Caez*, 81 *N. J. Super.* 315 (App. Div. 1963). In *Caez,* the court held unconstitutional a Hackensack ordinance which provided in pertinent part as follows:

"No person shall loiter, lounge or sleep in or upon any street, park or public place; . . . or obstruct passage through or upon any public street, park or public place". *Id.* at 318.

No definition of "loiter" was supplied. The court ruled that the ordinance was unconstitutionally vague in that it failed to provide a guide or standard by which it could be determined who was loitering. This failure, the court stated, allowed arbitrary enforcement by police officers which is the evil that is to be prevented.

In relying on the reasoning in *Caez,* all three courts in *Camarco,* the Law and Appellate Divisions and Supreme Court, emphasized that they were upholding the ordinance in that case with the condition that the unlawfulness of the act of loitering must be preceded by a refusal to heed

a warning by the officer that the "loiterer" must move on. Again, the evil sought to be prevented was arbitrary enforcement by police officers — the distasteful proposition that a police officer should have the unlimited discretion to determine who is in violation of the law and who is not.

It was this proposition — that the lawfulness of a person's standing on a street or sidewalk should depend on the whim of any police officer — that caused the United States Supreme Court to strike down a loitering provision in *Shuttlesworth v. City of Birmingham*, 382 *U. S.* 87, 86 *S. Ct.* 211, 15 L. Ed. 2d 176 (1965). The court stated in *dictum* in *Shuttlesworth* that a construction of the ordinance in question, making "loitering" a crime only after a failure to move on following a warning by a police officer, would render the ordinance constitutional. Apparently the same route was taken in *Camarco*.

Thus the key to judicial approval of this type of ordinance appears to be in controlling the conditions in which police officers are empowered to act. The rationale of the cases seems to be that of preventing the police from choosing among potential perpetrators the one whom they intend to prosecute.

█ While the case at bar is in a slightly different context, that of a curfew in a purely *park* setting, I am satisfied that the unmistakable thrust of the cases must control. I believe that prosecution under this ordinance as it now exists is unconstitutional on the basis of the reasoning in *Camarco, Caez* and *Shuttlesworth*. While this ordinance is a curfew ordinance, "loitering" is an element of the offense. Even absent the word "loitering" in the ordinance, some warning to leave the park must be issued by the police officer before the conduct, that of remaining in the park after 11:00 P.M., becomes unlawful. Since the ordinance contains no such provision to this effect, unlike that in *Camarco*, no construction by this court can save it. It devolves upon the Borough of Dumont, if it so desires, to enact an

ordinance which comports with the standards established by *Camarco* and as otherwise outlined in this opinion.

The Borough of Dumont Ordinance #536, Chapter 2–31 and the regulation adopted thereby are unconstitutional on their face and as applied to these defendants. The complaint is dismissed.