**COLUMBIA PICTURES CORPORATION v. ROGERS et al. and fourteen other cases.**

Nos. 201–215.

United States District Court
S. D. West Virginia.

Jan. 4, 1949.

Paxton & Seasongood and Evans L. De-Camp, all of Cincinnati Ohio, Sargoy & Stein, of New York City, and Luther G. Scott, of Bluefield, W. Va., for plaintiffs.

Joseph M. Sanders, of Bluefield, W. Va., and B. F. Howard, of Welch, W. Va., for defendants.

BEN MOORE, Chief Judge.

As will be seen from the caption, eight of these fifteen cases are brought against one set of defendants, and seven against another and individual defendant. The plaintiffs are various moving picture distributing corporations, which are mainly the same in each group of cases. I am of opinion that all the cases involve a common question of law, and that, generally speaking, they involve also common questions of fact. At the outset, therefore, an appropriate order should be entered consolidating them.

In each of the cases several motions are now pending. Plaintiffs have filed a motion for an order permitting them to make a complete audit of defendants' books; defendants have filed a motion to dismiss the actions on the ground that the matter in controversy in each case does not exceed the sum or value of $3,000; motions for a more definite statement of the plaintiffs' claims; and motions for an order requiring the plaintiffs to produce the licensing agreements in effect between plaintiffs and defendants during the period in controversy, which defendants say are the bases of plaintiffs' claims. Defendants have since announced that they do not insist on the motions for a more definite statement, and have filed answers in all the cases. Plaintiffs' motion for an order permitting an audit, and defendants' motions for an order requiring the production of the li-

censing agreements will be referred to at the conclusion of this opinion. I will now consider only the motion to dismiss for alleged lack of jurisdiction.

The claims for relief are stated in the complaints substantially in effect as follows: That plaintiffs over a period of years licensed to defendants as operators of moving picture theatres a series of films, numbering for the entire period and for all theatres, as shown by affidavits filed in opposition to the motion to dismiss for lack of jurisdiction, approximately ten thousand (some of these films were licensed on a percentage basis, and others on a flat rental basis); that the defendants during the period in controversy have continuously and systematically under-reported to plaintiffs the number of admission tickets sold by them for admission to the showings of various films; that such under-reporting was accomplished by means of fraud and trickery, and, in those cases involving multiple defendants, as the result of a conspiracy among these defendants; that thereby defendants have withheld from plaintiffs large sums of money which should have been paid on the percentage pictures, and have also induced the plaintiffs to license both flat rate and percentage films at a lower rate of rental or percentage than would have been done had the number of admissions been truthfully reported. Plaintiffs say that they are not able to allege the amounts which they say have been withheld, or from which plaintiffs; and they do not allege to what extent admissions to the showings of the various films were under-reported, nor what reductions in flat rentals or percentages were the result of such alleged under-reporting. They allege that the amount in controversy in each case is more than $3,000, and claim both actual and punitive damages. Defendants' answers, filed, as I have indicated, while the various motions were pending, deny all the substantial averments of the complaints.

The motion to dismiss on jurisdictional grounds has been submitted to the Court on affidavits and briefs. Plaintiffs have filed two affidavits of Edward A. Sargoy, an attorney, whose firm is special counsel for each of the plaintiffs, not only in these

actions, but in others of similar character throughout the nation. The purport of those affidavits, insofar as it is necessary to be digested here, is that as a result of a series of investigations by agents of affiant's firm of attorneys, reports have been made to affiant that on occasions when percentage pictures were being shown, checkers on the ground had observed that more paying patrons entered the theatre than were afterwards reported by defendants in their reports to plaintiffs of the number of admissions to the respective percentage films; that the same tickets were often resold, and the proceeds of only one sale accounted for; that patrons were sometimes admitted on payment of the admission price in money without being given a ticket, which admissions were not accounted for; that defendants often changed the opening and closing numbers on the ticket rolls with reference to percentage films so as to show a smaller number sold than were actually sold; that an employee of the defendants in the Rogers cases admitted that it was the custom of the defendants in those cases to report only fifty percent of the receipts, although books showing the correct receipts were kept; that receipts for two or more theatres were deposited at the same time for the purpose of confusing any one attempting to make an audit; that it was the custom of defendants to omit the first two digits of the serial numbers of the tickets on reports to plaintiffs so that gross receipts during periods between percentage pictures could not be calculated; that defendants sometimes reported only the serial numbers shown by the ticket vending machine instead of the serial numbers of the tickets being sold in order to confuse the checker and conceal the unreported receipts; and that the under-reporting was accomplished under direct instructions from one or another of the defendants. As to the defendant Mannie Shore, Sargoy says in his affidavit that reports from the agents of his firm were to the effect that one method regularly used by this defendant to conceal unreported receipts on percentage pictures was to use a separate roll of adult tickets; and that tickets would be sold from both adult rolls during the course of the percentage pictures, but the proceeds of only one of these rolls would be included in the report to the distributor, while the second roll would not be mentioned at all. Sargoy further states that reports as to two of the percentage films shown in the Rogers theatres and observed by checkers were to the effect that on one occasion the under-reporting of admissions amounted to more than $350, and on the other more than $500; that a similar report of a percentage picture shown in one of Shore's theatres during the use there of a double roll of adult tickets was to the effect that the total admissions to that particular film were under-reported by an amount in excess of $500; and that the usual percentage charged for exhibiting the percentage films was from twenty-five percent to fifty percent of gross receipts.

It is from these Sargoy affidavits that it appears, as I have already said, that approximately ten thousand different films licensed by the various plaintiffs were shown in all the theatres involved during the period in controversy. Of these, approximately eighty percent were said to have been flat rental films, and twenty percent percentage films.

Defendants have filed the affidavits of L. E. Rogers and Mannie Shore. These affidavits consist almost entirely of flat denials by affiants that any of the fraudulent practices reported to Sargoy occurred, or if they did occur, that defendants had any knowledge of them. Some of the practices, such as breaks in the continuity of ticket numbers and the omission of digits from the serial numbers reported to the distributors, are admitted, but it is explained that they were followed for the purpose of concealing from plaintiffs and from defendants' exhibitor competitors the actual condition of defendants' business, and not for the purpose of misleading any of the plaintiffs as to any fact they were entitled to know; and that in general all irregularities which might appear to exist in the conduct of their business are explainable in strict conformity with honesty and fair dealing.

There is a sharp difference of opinion between counsel as to the degree or character of proof which the Court should require in order to be satisfied that the

cases are properly within the jurisdiction of a Federal Court. Counsel for both plaintiffs and defendants agree that where the existence of the jurisdictional amount in controversy is challenged, the Court should make a preliminary inquiry to satisfy itself that requisite jurisdictional facts exist before proceeding further in the case. But counsel for plaintiffs take the view, citing the cases of St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845; Bell v. Preferred Life Assurance Society et al., 1943, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15; Calhoun et al. v. Kentucky-West Virginia Gas Co., 6 Cir., 166 F.2d 530, that it is the duty of the Court to accept jurisdiction, unless it is shown to a legal certainty that the jurisdictional facts do not exist; while counsel for defendants contend that the Court should hear evidence, either oral or in the form of affidavits (affidavits were stipulated here), and should be satisfied from the evidence adduced, with plaintiffs bearing the burden of proof, that the jurisdictional facts exist.

Defendants cite many cases in support of their view: KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183; McNutt, Governor, v. General Motors Acceptance Corporation, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; McNutt, Governor, v. McHenry Chevrolet Co., Inc., 298 U.S. 190, 56 S.Ct. 785, 80 L.Ed. 1141; Hague, Mayor, v. C. I. O. et al., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Buck et al. v. Gallagher, State Treasurer, 307 U.S. 95, 59 S.Ct. 740, 83 L.Ed. 1128; Thomson, Trustee, v. Gaskill et al., 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951; City of Forsyth et al. v. Mountain States Power Co., 9 Cir., 127 F.2d 583; Kurn et al. v. Beasley, 8 Cir., 109 F.2d 687; Reese v. Holm, D.C. Minn.1940, 31 F.Supp. 435; Gulbenkian v. Gulbenkian et al., D.C.S.D.N.Y.1940, 33 F.Supp. 19. They further contend that an affidavit based entirely on hearsay is not competent proof, and that therefore plaintiffs have, in effect, submitted no proof to the Court which will support their allegation that the matter in controversy in each case exceeds the sum or value of $3,000. I am of opinion, in comparing the cases cited by defendants with those which lay down the "legal certainty" rule, that the latter rule is not always applicable to cases such as those now under consideration, where jurisdiction has been challenged by the defendants and the Court is inquiring into the facts. However, I believe defendants have misconstrued the applicable rule, as laid down in the cases cited by them.

■ It is certainly not required that all the essential facts of the case in dispute between the parties be tried by the Court in this preliminary inquiry, and that a decision be made on those facts after weighing the evidence and determining which witnesses are testifying truthfully. Such a prejudgment, in any case, would be contrary to all accepted principles of litigation in the courts. What then is the fact, or what are the facts, of the existence of which the Court should be satisfied before jurisdiction is sustained? I believe the only pertinent facts to be shown are, that a matter in controversy exists, and that such matter in controversy exceeds the sum or value of $3,000. A matter in controversy exists whenever a plaintiff believes in good faith and on the basis of information in his possession that he has a just claim against a defendant which that defendant denies. The inquiry then, as I see it, is to be directed to ascertaining whether or not the plaintiffs do have such a matter in controversy with the defendants; that is, do they have claims against the defendants in the respective cases, which they assert in good faith; do they have reasonable grounds for believing that those claims are just; and do they have like reasonable grounds for asserting that the respective claims amount in value to more than $3,000?

■ The determination of this question is not dependent upon plaintiffs' producing before the Court at this time testimony of the ultimate facts which they hope to prove in the trial of the cases. It is enough if they show as facts that they have what they believe, in good faith, to be reliable information that circumstances which go to make up a matter in controversy exist, of a magnitude sufficient to invoke the jurisdiction of a Federal Court.

■ This I believe the plaintiffs have done by the affidavits of Edward A. Sargoy. Defendants have, it is true, denied

by their affidavits the existence of those ultimate facts which it is necessary that plaintiffs prove by a preponderance of evidence if they are to have the relief prayed for in their complaints. If the Court were now passing on the merits of plaintiffs' claims, there would be no basis for finding that plaintiffs have sustained the burden of proof in establishing their alleged facts. However, defendants' affidavits in no wise disprove the statements in Sargoy's affidavit to the effect that reports of investigators which he considers reliable show the existence of the facts as alleged. The existence of such reports is itself a fact, though not one of the ultimate facts.

While plaintiffs frankly admit that they do not know the extent of the alleged under-reporting, or which of the plaintiffs were defrauded thereby, yet I believe there is enough in the reports described by Sargoy to justify the conclusion on the part of plaintiffs that, assuming the reports to be true, there is reasonable cause to believe that there is in controversy in each case more than $3,000. With respect to the Rogers case, it is stated upon information from the reports, as I have outlined, that an employee of the defendants admitted that it was defendants' custom to report only fifty percent of the receipts from percentage pictures; and that on two occasions, when checkers employed by plaintiffs counted the actual paid admissions, unreported receipts were ascertained to be more than $350 and $500, respectively. With respect to the Shore cases, like information in the reports was that a checker had observed a practice of using two rolls of adult tickets instead of one, the proceeds of only one of which were reported, and that on one occasion he had observed and counted admissions totalling more than $500 in excess of the receipts reported for that particular film.

Considering the large number of percentage films exhibited over the period in controversy in the various theatres operated by defendants, it is reasonable to believe that if large shortages in reporting such as have been mentioned took place in connection with one or more particular films, a proportionately similar amount of shortages might be expected to have taken place in connection with the reporting of other percentage films; and since the percentage rate varied from twenty-five percent to fifty percent of gross receipts, that the aggregation of shortages as to each plaintiff would produce an amount greatly in excess of the minimum required for federal jurisdiction. It remains, of course, to be proved that these events did actually occur, but that is a matter for the trial, and not for determination in disposing of this motion.

Whether the allegations concerning loss to the plaintiffs in lower flat rate license fees and percentage agreements, resulting from defendants' alleged practice of under-reporting, can be considered as an element to swell the amount of plaintiffs' claims, and whether this is the type of case in which punitive damages can be claimed, and therefore used as one of the elements in determining the amount in controversy, I do not decide at this time; since I conclude that the single element of alleged fraudulent withholding of receipts from percentage pictures is enough.

The defendants' motion to dismiss these cases for lack of federal jurisdiction will be overruled. There will then remain pending defendants' motions for an order requiring production of the licensing agreements, and plaintiffs' motion for an order permitting an audit of defendants' books.

Since defendants have filed their answers in the cases, and since these answers set up as an affirmative defense that plaintiffs' claims are based on licensing agreements (the same, as I assume, in all cases) which are alleged by defendants to be illegal and unenforceable, I direct the plaintiffs, as the Court is authorized to do under Rule 7(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to make reply to those allegations in defendants' answers which relate to the licensing agreements. I presume that, as a matter of course, plaintiffs will file as part of such reply the licensing agreements referred to, and that this will serve the purpose of defendants' motions to produce them; but in case such agreements are not so filed, I will sustain defendants' motions for their production.

Upon the coming in of plaintiffs' reply, it is probable that a further question will be presented to the Court which should be decided before the Court acts upon plaintiffs' motion for an order permitting them to audit defendants' books. This question relates to the legality of the licensing agreements, and can be decided only by analyzing the agreements and evaluating plaintiffs' allegations in the light thereof. If the Court should hold with the defendants in their contention that no recovery can be had because of illegality of the licensing agreements, then it would be futile and harmful to permit plaintiffs to conduct an exhaustive examination of defendants' books.

I will therefore reserve decision upon plaintiffs' pending motion until such time as it may appear that plaintiffs have the right to proceed with their actions, notwithstanding defendants' allegations with reference to the supposed illegality of the licensing agreements.

An appropriate order may be entered in accordance with this opinion.