JEWS FOR JESUS, INC., a California non-profit religious corporation and Alan Howard Snyder, a.k.a. Avi Snyder, Plaintiffs,

v.

The BOARD OF AIRPORT COMMISSIONERS OF the CITY OF LOS ANGELES; Johnnie L. Cochran, Jr., President of the Los Angeles Board of Airport Commissioners; Robert A. Chick, Vice-President of the Los Angeles Board of Airport Commissioners; and D.A. "Curt" Curtiss, Maria D. Hummer, and Samuel Greenberg, Members of the Los Angeles Board of Airport Commissioners, the last five in their official and individual capacities; City of Los Angeles, a municipal corporation, Defendants.

No. CV 84–5268–ER.

United States District Court, C.D. California.

March 29, 1985.

Meserve, Mumper & Hughes, Paul G. George, Bruce A. Gothelf, Joel D. Covelman, Los Angeles, Cal., for plaintiffs.

James K. Hahn, City Atty., James H. Pearson, James R. Kapel, Asst. City Attys., Denise M. Beaudy, Deputy City Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM DECISION AND JUDGMENT

RAFEEDIE, District Judge.

The above captioned matter came before this Court for trial without a jury on January 8, 1985. Prior to trial the Court indicated to counsel its desire to treat the trial briefs as cross motions for summary judgment. None of the parties planned to call witnesses at trial and counsel for all defendants orally stipulated to the facts stated in plaintiffs' Exhibit #1 ("Stipulated Facts for Trial"). As there were no genuine issues of material fact to be decided at trial and without objection from the parties, the oral argument was held as argument on cross motions for summary judgment on the constitutionality of Board of Airport Commissioners of the City of Los Angeles Resolution No. 13787.[*]

## FACTS

Defendant Board of Airport Commissioners of the City of Los Angeles ("Board of Airport Commissioners"), pursuant to City of Los Angeles Charter § 238.4, manages and controls all airports owned by the City of Los Angeles including Los Angeles International Airport ("LAX").

On July 13, 1983 at a special meeting the Board of Airport Commissioners adopted

---

[*] The stipulated Facts for Trial and the text of Resolution No. 13787 are attached hereto as Appendix 1 and Appendix 2, respectively.

Resolution No. 13787 ("the Resolution") which states in part:

> NOW, THEREFORE BE IT RESOLVED by the Board of Airport Commissioners that the Central Terminal Area at Los Angeles International Airport is not open for First Amendment activities by any individual and/or entity;

> \*   \*   \*   \*   \*   \*

> BE IT FURTHER RESOLVED that if any individual or entity engages in First Amendment activities within the Central Terminal Area at Los Angeles International Airport, the City Attorney of the City of Los Angeles is directed to institute appropriate litigation against such individual and/or entity to ensure compliance with this Policy statement of the Board of Airport Commissioners;

Plaintiffs challenge the constitutionality of the Resolution on three grounds: (1) that it is unconstitutional on its face because it totally bans First Amendment activity in a public forum; (2) that the Resolution is unconstitutional as applied to plaintiffs because it only has been used to ban certain kinds of communicative conduct such as leafletting by plaintiffs; and (3) that it is unconstitutionally vague and overbroad because the term "First Amendment activities" does not give guidance to officials or the public as to what activity is prohibited. Finding the Resolution unconstitutional on its face, this Court does not reach the second and third challenges to the Resolution.

Plaintiffs are Jews for Jesus, a non-profit religious corporation, and Alan Howard Snyder, a minister of the Gospel for Jews for Jesus. On Friday, July 6, 1984 Snyder was distributing free religious literature at LAX when he was approached by a uniformed Department of Airports peace officer who showed Snyder a copy of the Resolution, explained that Snyder was in violation thereof, and asked Snyder to leave. The officer warned Snyder that if he refused to leave the City would take legal action against him. Snyder stopped distributing the leaflets and immediately left the airport terminal.

## CONSTITUTIONALITY OF THE RESOLUTION

The First Amendment stops government from passing laws abridging the freedom of speech and the right of the people peaceably to assemble. *U.S. Const.* Amend. I. At least since 1939 it has been clear that government cannot ban First Amendment activity totally in traditionally public places. First Amendment activities in such places are, however, subject to valid time, place and manner restrictions. *See e.g. Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). As the Supreme Court wrote in *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. *The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all;* it is not absolute, but relative and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; *but it must not, in the guise of regulation, be abridged or denied.*

307 U.S. at 515–16, 59 S.Ct. at 964 (emphasis added).

The resolution being challenged by plaintiffs here completely bans First Amendment activity in the Central Terminal of LAX and therefore must be struck down if the Central Terminal is a public forum like the streets and parks discussed in *Hague.* The question then facing the Court is whether a municipally owned and operated airport terminal is a public forum. The question is easily answered. Numerous appellate opinions have held that airport terminals are public forums. *Kuszynski v.*

*City of Oakland,* 479 F.2d 1130 (9th Cir. 1973) is the seminal case on the subject. The ordinance challenged and struck down in *Kuszynski* provided that "The use of the Airport for the purpose of exercising free expression and communication ... shall not be allowed to impair or interfere with the transportation function of the airport. The exercise of such rights shall be in accordance with [certain rules and regulations]." Among other things, the regulations required approval of the airport manager before an exercise of First Amendment rights and limited leafleting to four hours. In a brief opinion the court concluded, "Since the airport is public property ... free speech may be abridged only by regulations narrowly drawn to serve legitimate interests of the general public who use the airport." *Id.* at 1131. The court found the ordinance invalid because there was no showing that the restrictions were reasonable. The court ordered the district court to "enjoin the enforcement of those portions of the ordinance not found to be reasonably necessary to airport management." *Id.*

This Court need go no further in analyzing the Board of Airport Commissioner's case. It is obvious from the one page opinion of the Ninth Circuit in *Kuszynski* that airports are public forums. While it belabors the obvious to address the question further, the Court will briefly discuss other precedents supportive of plaintiffs' argument.

In *Rosen v. Port of Portland,* 641 F.2d 1243 (9th Cir.1981) the Ninth Circuit wrote: "The first amendment is to be given full effect in public areas of airport terminal buildings.... However, the regulation of activity that interferes with the normal use of an airport facility is a proper governmental function." *Id.* at 1245–46. In *Rosen* the appellate court reversed a district court and found the restrictions imposed by the Port of Portland were unconstitutional. "Both the advance notice and the identification provisions of the challenged ordinance violate the United States Constitution.... persons desiring to exercise their free speech rights may not be required to give advance notice and to identify themselves

and their sponsors to Port authorities." *Id.* at 1252. It is obvious that if Portland cannot require advance notice by and identification of leafleters, Los Angeles cannot ban them all together. LAX is a public forum and the challenged Resolution is unconstitutional. *Accord S.W. Africa/Namibia Trade & Cult. Coun. v. U.S.,* 708 F.2d 760 (D.C.Cir.1983) (National and Dulles airports public forums); *Fernandes v. Limmer,* 663 F.2d 619 (5th Cir.1981) (Dallas-Fort Worth Airport a public forum). In *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir.1975) the City of Chicago claimed "that the public receives a limited invitation to use O'Hare Airport for travel purposes only" but the 7th Circuit found that argument was neither supported by the evidence nor ... realistic" and held that O'Hare Airport is a public forum. 508 F.2d at 925. The City of Los Angeles makes the same claim as the City of Chicago did. It is no more persuasive in 1985 than it was in 1975.

When asked what makes LAX, the third busiest airport in the world, different from National, Dulles, Dallas-Fort Worth and O'Hare airports, defendants' counsel stated that those airports chose to be public forums by enacting time, place, and manner restrictions and LAX did not. This argument, while creative, is supported neither by fact nor law.

As a factual matter, the City has stipulated that "a variety of religious and/or political groups have utilized the interior area of terminals at LAX, including the pedestrian walkways located therein, to distribute literature, solicit funds, and communicate ideas." The City further stipulated that "the interior of terminal areas at LAX, including the pedestrian walkways located therein, have been utilized on a number of occasions by print, television and radio media for the purpose of filming, photographing and/or interviewing public figures." The City also stipulated to other uses of LAX for non-travel related matters. *See* Appendix 1.

More importantly, the contention that an airport is not a public forum unless the City consents to it being such is without

legal support. A similar argument was rejected by the Second Circuit when it faced the question "May the Port of New York Authority bar the use of its terminal to all exercises of First Amendment rights?" *Wolin v. Port of New York Authority*, 392 F.2d 83 (2nd Cir.1968). The answer was no for the Port Authority and it is no for the Board of Airport Commissioners. Streets, parks and airports do not become public forums because government consents to their use as such. They are public forums, as the Supreme Court explained in *Hague*, because they are traditional gathering places for the citizenry. They are held in trust by government for public use.

In recent years the Supreme Court has grappled with difficult questions of what constitutes a public forum. *E.g., Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (lampposts); *U.S. Postal Service v. Council of Greenburgh*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (mailboxes). Despite the difficulty in applying public forum analysis to all government property "generally an analysis of whether property is a public forum provides a workable analytical tool." *Members of City Council v. Taxpayers for Vincent*, 104 S.Ct. at 2134 n. 32. Public forum analysis is a workable tool here. This is not a difficult case. An airport used by an estimated 60 million people a year is a public forum. First amendment activity cannot be banned at LAX. Resolution No. 13787 is unconstitutional. Defendants are enjoined from enforcing it.

Judgment is entered for plaintiffs.

### APPENDIX 1

### STIPULATION OF FACTS

1. The City of Los Angeles ("City") is a municipal corporation and is the owner of the real property and facilities commonly known as Los Angeles International Airport (hereinafter "LAX").

2. The Board of Airport Commissioners of the City of Los Angeles (hereinafter "Board") is charged by the Los Angeles City Charter with the management and control of the Los Angeles Department of Airports (hereinafter "Department").

3. The Department is a department of the City and operates LAX under the direction and control of the Board.

4. The LAX complex encompasses approximately 3500 acres consisting of three general areas: (A) the restricted or "field side" area containing runways, taxiways, airline maintenance and cargo facilities, aircraft loading ramps, and various aircraft service facilities; (B) Airport-owned property surrounding the restricted area; and (C) the Central Terminal Area (hereinafter "CTA") which contains the terminal facilities (ticketing counter, baggage claim, waiting and loading gates), parking structures, and a series of private streets and roadways which provide vehicular access to the CTA. There are presently eight (8) terminal buildings open to the public for Airport use at LAX. Each of these eight (8) terminal facilities contain large areas open to the public, including the pedestrian walkways, ticketing and baggage claim areas, baggage lockers, check-in gates, loading gates, cocktail lounges, waiting areas, aircraft loading gates, restaurants, newsstands, gift shops, barber shops, art displays (see paragraph 28), information displays, flight insurance counters, rent-a-car counters, hotel, motel, restaurant and ground transportation advertising displays, rest areas, including chairs and benches, restrooms, automatic travellers check and banking machines and general waiting areas. Most of these terminal facilities have offices for Airport tenants which are generally not open to the public.

5. The public is permitted unrestricted access to the portions of the airport terminal interiors identified in Paragraph 4(C), above.

6. As a part of the expansion program at LAX, a second level roadway system has been constructed which essentially duplicated the existing roadway system by creating an upper level, or second level, roadway system above the surface roads. This second level roadway system was designed

to alleviate, at least in part, the vehicular and pedestrian congestion at LAX.

7. As a part of the expansion program, each of the terminal facilities was expanded (or is presently being expanded) to provide access to those facilities from the upper level roadway. Thus, a passenger departing from LAX generally arrives on the upper level roadway, enters the terminal facility and proceeds after any necessary ticketing and baggage check-in to the waiting areas and terminal gates. A passenger arriving at LAX by air disembarks from the aircraft and proceeds, at least in most terminals, on a lower level tunnel to the baggage claim area and then out of the terminal on to the sidewalk and to any required ground transportation.

8. The planned expansion and construction project at LAX has recently been substantially completed. This expansion of existing terminals and construction of new terminals at LAX has had the effect of reducing the levels of pedestrian and vehicular congestion both inside and outside of the terminal complexes to levels below those which existed prior to the commencement of the expansion and construction project.

9. In front of the terminal facilities on both levels of the roadway are sidewalks which extend approximately twelve (12) to sixteen (16) feet from the terminal entrance.

10. LAX is the third busiest airport in the world. LAX handled more than 32 million passengers in 1982, more than 33 million passengers in 1983, and it is anticipated will handle more than 34 million passengers in 1984. It is estimated that at least an equal number of "meeters and greeters" enter the CTA to pick up or drop off airline passengers.

11. LAX is the largest destinational airport in the world with the largest number of enplaning and deplaning passengers.

12. Approximately 75 percent of the passengers who use LAX commence or terminate their flight travel at LAX.

13. Approximately 25 percent of the passengers who use LAX do not commence or terminate their flight travel at LAX.

14. Because approximately 75 percent of the passengers either commence or terminate their flight travel at LAX, at least 75 percent of the passengers must use the sidewalk area in front of the terminal facilities.

15. Because approximately 25 percent of the passengers do not either commence or terminate their flight travel at LAX, at least 25 percent of the passengers do not use the sidewalk area in front of the terminal facilities.

16. Article XXIV, section 238.8 of the Los Angeles City Charter provides as follows:

The Board shall have power to grant franchises, permits and licenses to, and to enter into leases with, any person, firm or corporation, or agency of the government for the use of any municipally owned or controlled airport or any part of facility thereof, for the promotion and accommodation of air commerce and air navigation, or use incidental thereto, together with the right to use said airport in common with others as necessary to the right granted. (Amended, 1951.)

The Board shall likewise have power to enter into leases with any person, firm or corporation for purposes other than for the promotion and accommodation of air commerce and air navigation covering any portion of the airport property whenever the Board shall determine that the use of such portion of the Airport property is not necessary for the promotion and accommodation of air commerce and air navigation or use incidental thereto.

17. Article XXIV, section 239.5 of the Los Angeles Charter provides as follows:

Whenever it shall be determined by the Board by order that certain parts of any airport owned, operated or controlled by the city may not be required at such time for use in connection with, or for the promotion and accommodation of air commerce and air navigation, the general manager shall have power to issue revocable permits to use limited portions of

such space for any and all purposes which shall not interfere with air commerce or air navigation and not inconsistent with any trust upon which such land may be held by the City of Los Angeles. Every such permit shall first be approved by the Board and shall prescribe that it shall be revocable, without compensation to the lessee or permittee, upon due notice to be stated therein, such notice in no case to exceed one year.

18. For the use of the terminal facilities, the Department has entered into permits, license agreements, leases, and concession agreements to provide food and beverage service, news and gift facilities, flight insurance, money exchange facilities, ground transportation, waiting areas, ticket counters, lockers, and baggage facilities.

19. The Defendants believe that the services and facilities that the Department has permitted within the terminal facilities at LAX are designed to aid the traveling public and to promote and accommodate air commerce and navigation.

20. The Department has attempted to limit the use of the terminal facilities to those uses which it believes directly aid the traveling public and thereby promote and accommodate air commerce and air navigation.

21. In the Department's opinion, it has never given a license permit or lease which allows any non-airport related commercial use of the terminal facilities.

22. During at least the past ten (10) years, a variety of religious and/or political groups have utilized the interior area of terminals at LAX, including the pedestrian walkways located therein, to distribute literature, solicit funds, and communicate ideas.

23. Defendants are or have been aware that a variety of religious and/or political groups have conducted distribution, solicitation, or communication activities at LAX without the express or implied permission of the Board or D.O.A.

24. As to the activities described in Paragraphs 22 and 23, above, defendants often became aware of many of the groups engaging in those activities only after the group had conducted its activity and had left the terminal facilities.

25. The interior of terminal areas at LAX, including the pedestrian walkways located therein, have been utilized on a number of occasions by print, television and radio media for the purpose of filming, photographing and/or interviewing public figures, such as political candidates, the Mayor of Los Angeles, and the chairman of the Los Angeles Olympic Organizing Committee. On several occasions, numerous individuals and news media personnel have gathered inside the terminal facilities at LAX to greet some of the sports teams that were returning from road games.

26. Defendants have obtained knowledge of some of the activities described in Paragraph 25 above, but often that knowledge was obtained after the event occurred.

27. A picture of the Mayor of the City of Los Angeles is displayed in each of the terminals at LAX on a sign that states "Mayor Tom Bradley Salutes the New LAX—Gateway to the Olympics."

28. Artwork created by children that depicts airport scenes has been displayed in the terminal facilities with the express knowledge and permission of the defendants.

29. A display entitled "Think Before You Buy", containing specimens, pictures, and information pertaining to protected species, has been constructed and maintained inside terminal 2 at LAX with the express knowledge and permission of defendants. The text of this display reads as follows:

This exhibit was designed and installed by the Natural History Museum of Los Angeles County in cooperation with the Los Angeles City Attorney's Office, U.S. Fish and Wildlife Service, National Marine Fisheries Service and the Los Angeles Department of Airports. Major assistance and funding was provided by TRAFFIC (U.S.A.)—Trade Records Analysis of Flora and Fauna in Commerce—a scientific, fact-finding program of World Wildlife Fund—U.S. monitoring

the international trade in wild animals and plants.

30. A photographic display depicting photographs of various athletes was constructed and maintained inside terminal 7 at LAX for approximately two (2) to three (3) weeks in 1984 without the express knowledge and permission of defendants. The text of this display read as follows:

Photographs of America's Olympic Hopefuls. Sponsored by the Shooting for the Gold Foundation with a grant from Fuji Photo Film U.S.A. Inc.

31. The defendants have not restricted access by members of the general public to the interior of terminal areas at LAX to only those persons who are engaged in the use of the LAX facilities for interstate travel or for purposes of meeting or greeting airline passengers. The defendants do not attempt to restrict members of the general public from walking through the unrestricted interior of terminal areas at LAX. Defendants do not attempt to restrict members of the general public who have no purpose or desire to utilize the transportation-related facilities within the terminal areas at LAX from walking, reading, shopping, eating, drinking, and conversing with other members of the general public in the interior of terminal areas at LAX.

32. The defendants have not in the past, and do not in the present, prohibit persons wearing T-shirts or other articles of clothing imprinted with slogans, statements, or other forms of religious or political communication from walking in the interior terminal areas of LAX.

33. The defendants have expressly allowed the exercise of commercial speech in the interior of terminal areas of LAX, including areas directly attached to or in the vicinity of the pedestrian walkways located therein, in the form of advertising displays in connection with hotel, motel, restaurant, ground transportation and other services offered by commercial vendors which the defendants believe are of interest to the traveling public.

34. The expansion of LAX has been advertised on buses owned and/or operated by the Southern California Rapid Transit District and on buses owned or operated by the D.O.A. The defendants were aware of this advertising but did not exercise their right to prohibit it.

35. The defendants have promoted the new facilities at LAX through press releases to print, television and radio media and through the purchase of radio advertising.

36. Immediately prior to, and during the 1984 summer Olympic Games in Los Angeles, free standing "Olympic Family" booths were set up by the LAOOC with the express consent of the defendants within the terminal areas at LAX. The purpose of the booths was to provide information to athletes and/or other Olympic officials who were members of the "Olympic Family." Upon request, personnel working in said booths provided general information to members of the general public.

37. On approximately July 25, 1984, television crews filmed a demonstration of the operation of a Mobile Emergency Rescue Vehicle (MERV) inside a terminal at LAX for subsequent broadcast to the public on commercial television networks. MERV is part of the medical response program provided by defendants at LAX.

38. Defendants have known that various people and groups have wished to conduct and, in some instances, have conducted speech-related activities within the terminal areas at LAX.

39. The activities described in Paragraph 38, above, were conducted against the wishes and policies of defendants and without the express permission of defendants.

40. The Department has never given the Plaintiffs, or any of them, explicit permission to distribute free religious literature within the terminal facilities at LAX.

41. The Plaintiffs, and each of them, have distributed free religious literature within the terminal facilities at LAX during the past ten years.

42. In the past, the Department has received a variety of requests from people in numerous organizations who wish to con-

duct activities which defendants believed were non-airport related, including First amendment activities, within the terminal facilities at LAX. Examples of organizations which have requested, but have been denied, permission to use the terminal facilities are: The Red Cross, Salvation Army, Girl Scouts, Boy Scouts, Ford Motor Company, Iran Relief Fund, Hunger Campaign, KCET, Women's Sports Foundation, and Verdi Restorante.

43. The Department has denied the requests referred to in paragraph 42 to conduct First Amendment activities within the terminal facilities and has thus precluded those activities from taking place within the terminal areas of LAX.

44. The Department is a department of the City and is financially self-sufficient and does not rely on or or use tax revenues to finance its operations.

45. The monies necessary to pay for the operation and the development of LAX are collected from all persons using or occupying LAX on a consistent and regular basis.

46. Individual members of the traveling public and other members of the general public who enter and/or utilize the interior terminal areas at LAX are not charged any fee by the Department for their use of the terminal facilities.

47. Most persons occupying space on an extended basis within the terminal facilities pay either a rental based on the square feet occupied or a percentage of gross revenues derived from the use of that space or both. For example, the concession agreements and leases with the rent-a-car companies require that those companies pay a rent for the space occupied inside their terminal facilities and also a percentage of gross receipts in order to conduct their business at LAX. The news and gift stands and the food and beverage stands within the terminal facilities pay both rent and a percentage of gross receipts on a similar basis. Air carriers also pay a square-footage rental based on the area they occupy within the terminal facilities for ticket counters, baggage claim areas, waiting areas, and loading gates. In addition, air carriers pay a landing fee based on the weight of the aircraft which land at LAX.

48. The only exceptions to the policy set forth in paragraph 47 above are: (a) the various federal inspection services such as customs and immigration; (b) the Travelers Aid Society which provides information services to the traveling public; and (c) the USO which provides assistance to military travelers.

49. The monies collected from rents, concession fees, permit charges and landing fees described in paragraph 47 above pay for the Department's bonded indebtedness and the expenses necessary to operate LAX.

50. The Board has attempted to limit use of the terminal facilities at LAX to those activities which it believes directly aid the traveling public.

51. The Board has not expressly permitted any commercial or First Amendment activities within the CTA which defendant believes are unrelated to LAX and the services it provides.

52. On July 13, 1983, the Board passed Resolution No. 13787.

53. The only exception to the rules set forth in Resolution No. 13787 provides that anyone wishing to exercise his First Amendment rights within the CTA must do so on the sidewalks outside of and in front of the terminal buildings.

54. Resolution No. 13787 does not prohibit, and the defendants have never prohibited, anyone from entering the terminal facilities at LAX.

55. Jews for Jesus, Inc. ("Jews for Jesus") is a non-profit religious corporation duly organized and operating pursuant to, the laws of the state of California.

56. Jews for Jesus is an expression of the Christian faith which, as one of its principle purposes, preaches the Gospel of Jesus Christ, and promotes religious ideals consistent with the Old Testament and the New Testament.

57. Avi Snyder ("Snyder") is an individual member and minister of Jews for Jesus and is the Los Angeles director of Jews for Jesus.

58. The acts and practices of all of the named defendants and their agents, as described herein, were performed under color of state law and were actions of the state within the meaning of 42 U.S.C. § 1983 and Fourteenth Amendment to the United States Constitution.

59. Synder, and other members of the plaintiff Jews for Jesus, have on several occasions distributed literature inside the terminal facilities at LAX.

60. Distribution of religious literature and leaflets, free of charge by members of Jews for Jesus, including Snyder, provides information to the general public about the religious teachings of Christianity and is a method by which plaintiffs evangelize.

61. It is the express policy of Jews for Jesus that its members, including Snyder, must neither solicit nor accept, any money whatsoever, while distributing free religious literature in the terminal buildings of LAX.

62. Jews for Jesus has a general policy which forbids its members, including Snyder, while engaged in the free distribution of religious literature at any location, including the interior terminal walkways of LAX, from harassing, interfering with, blocking, obstructing, physically touching or otherwise intentionally annoying any other person.

63. The parties are not aware of any occasion on which a member of Jews for Jesus, including Snyder, while engaged in the free distribution of religious literature in the interior terminal walkways of LAX, has intentionally harassed, interfered with, blocked, obstructed, physically touched in an offensive manner or otherwise intentionally annoyed any other person.

64. Only July 13, 1983, the Board, acting pursuant to authority vested in it by City, enacted Resolution No. 13787. This resolution, on its face, bans, among other things, all "First Amendment activities" from the interior of terminal areas at LAX otherwise open to the public without restriction, including the pedestrian walkways located within said terminals.

65. Resolution No. 13787 purports to ban all airport activities which defendants believe to be non-airport related.

66. Resolution No. 13787 allows the conduct of First Amendment activities on the sidewalks immediately outside of the terminals located at LAX.

67. Only July 6, 1984, at approximately 10:00 a.m. in LAX Terminal 4, Snyder was engaged in the distribution of Jews for Jesus religious literature on a pedestrian walkway. In distributing the religious literature, Snyder was not blocking any entrance, exit, stairway, escalator, elevator, door, or otherwise inhibiting the free flow of pedestrian traffic on the pedestrian walkway located inside Terminal 4 at LAX.

68. During the distribution of free religious literature as described in Paragraph 67, Snyder was not touching, annoying, blocking, obstructing, or otherwise harassing any other person present in the immediate vicinity of his location on the pedestrian walkway located in the interior of Terminal 4 at LAX.

69. At or about the time that Snyder was engaged in the activities described in Paragraph 67 and 68, above, a uniformed peace officer, acting pursuant to Resolution 13787, approached Snyder and handed him a copy of Resolution 13787. Pursuant to the policy of the defendants as reflected in the Resolution, the peace officer ordered Snyder to cease distribution of any literature within the terminal areas at LAX, including the pedestrian walkways where the activities had, up to that point, been conducted. The peace officer further advised Snyder that any failure to comply with his order would subject Snyder to legal action by the City Attorney pursuant to the express terms of Resolution No. 13787. Snyder ceased the distribution of literature and left the interior terminal in compliance with the order of the peace officer.

70. The acts of the peace officer as described in Paragraph 69, above, were performed under color of state law pursuant to the express policy of the Board as set forth in Resolution No. 13787 had the purpose and effect of preventing Snyder

■■■

from engaging in the distribution of free religious literature anywhere inside the LAX terminal buildings, including the pedestrian walkway where he had been engaged in the distribution of free religious literature.

71. Defendants have prevented and/or chilled, (and will continue to prevent and/or chill) plaintiffs' distribution of free religious literature inside the terminal areas at LAX pursuant to upon Resolution No. 13787.

72. If, as the plaintiffs contend, Resolution No. 13787 is unconstitutional on its face or as applied to plaintiffs' activities inside of the terminal areas at LAX, then plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm.

73. If, as the plaintiffs contend, Resolution No. 13787 is unconstitutional on its face or is applied to plaintiffs' activities, plaintiffs have no plain, speedy, speedy or adequate remedy at law to address said constitutional violations and any of the remedies to which plaintiff could be relegated would be attended by such uncertainties and delays that they would cause further irreparable damages, injury and inconvenience to plaintiffs. Damages are not adequate to protect plaintiffs from the continuing injury which would arise from said constitutional violations.

74. Defendants permit the operation of a Christian Science Reading Room inside terminal 7. This Reading Room is open to the public. The Reading Room displays religious literature pertaining to the Christian Science faith. The Reading Room has been in operation in the same location inside of the terminal building since 1966. The Reading Room has occupied and now occupies leased space for which it pays a monthly rental of $510.00.

## APPENDIX 2

### RESOLUTION NO. 13787

WHEREAS, pursuant to City of Los Angeles Charter Section 238.4, the Board of Airport Commissioners shall have possession, management, charge, superintendence and control of all airports, airport sites, and all equipment, accommodations and facilities for aerial navigation, flight, instruction and commerce belonging to or pertaining to this city; and

WHEREAS, pursuant to Charter Section 238.5, the Board shall fix, regulate and collect rates or charges for the use of all buildings, grounds, facilities, utilities and structures which are owned, controlled or operated by the city in connection with or for the promotion or accommodation of air commerce and air navigation, and for services in connection therewith; and

WHEREAS, pursuant to Charter Section 238.8, the Board shall have the power to grant franchises, permits and licenses to and to enter into leases with any person, firm or corporation, or agency of the government for the use of any municipally owned or controlled airport or any part of facility thereof, for the promotion and accommodation of air commerce and air navigation or use incidental thereto; and

WHEREAS, also pursuant to Section 238.8 of the City Charter, the Board shall have the power to enter into leases for purposes other than for the promotion and accommodation of air commerce and air navigation covering any portion of the airport property whenever the Board shall determine that the use of such portion of the airport property is not necessary for the promotion and accommodation of air commerce and air navigation or uses incidental thereto; and

WHEREAS, the Board considers the Central Terminal Area, which for purposes of this Resolution consists of the ticketing and satellite facilities and the parking structures and areas and streets, roadways and bridges adjacent thereto at Los Angeles International Airport to be vital facilities for the promotion and accommodation of air commerce and air navigation and uses incidental thereto; and

WHEREAS, the existing Central Terminal Area at Los Angeles International Airport currently accommodates and processes approximately 34 million annual passengers and an equal number of meeters and greeters; and

WHEREAS, the Board of Airport Commissioners is currently engaged in an expansion program of Central Terminal Area at Los Angeles International Airport due to the extreme congestion in the Central Terminal Area; and

WHEREAS, the projected growth of air passenger traffic at Los Angeles International Airport is anticipated to reach a level of 40 million annual passengers by the year 1986; and

WHEREAS, the primary purpose of expanding the Central Terminal Area at Los Angeles International Airport is to accommodate more efficiently the traveling public at Los Angeles International Airport and to enhance the promotion and accommodation of air commerce and air navigation or uses incidental thereto; and

WHEREAS, even with the expanded Central Terminal Area at Los Angeles International Airport said facilities will continue to experience high periods of passenger traffic and congestion; and

WHEREAS, it is the objective of the Board of Airport Commissioners to keep the Central Terminal Area as free as possible from congestion and obstructions as an aid to the traveling public and in the promotion of air commerce and air navigation and uses incidental thereto; and

WHEREAS, in recognition of its Charter duty to accommodate and promote air commerce and air navigation and uses incidental thereto, the Board of Airport Commissioners determines that due to the vital nature of the Central Terminal Area, no portion thereof should be utilized for a purpose not connected with the promotion and accommodation of air commerce and air navigation and uses incidental thereto; and

WHEREAS, over the past several years, various individuals and/or entities have attempted to engage in First Amendment activities within the Central Terminal Area; and

WHEREAS, said individuals and/or entities engaging in such First Amendment activities have significantly interfered with the free flow of passenger traffic in the Central Terminal Area at Los Angeles International Airport and substantially contributed to the congestion in said Central Terminal Area; and

WHEREAS, such interference with passenger traffic and congestion caused by First Amendment activities in the Central Terminal Area are counterproductive to the objectives of the Board in accommodating air commerce and air navigation or uses incidental thereto; and

WHEREAS, engaging in First Amendment activities in the Central Terminal Area at Los Angeles International Airport is incompatible with the character and function of said Central Terminal Area; and

WHEREAS, the Board of Airport Commissioners does not issue permits at Los Angeles International Airport to individuals and/or entities to engage in First Amendment activities within the Central Terminal Area at Los Angeles International Airport; and

WHEREAS, over the years, the various individuals and/or entities which have engaged in First Amendment activities within the Central Terminal Area at Los Angeles International Airport have done so without the consent or approval of the Board of Airport Commissioners; and

WHEREAS, extensive litigation involving various city ordinances and state statutes has not resolved the issue of whether the Central Terminal Area at Los Angeles International Airport constitutes an area which is open for the conduct of First Amendment activities; and

WHEREAS, the Board of Airport Commissioners, irrespective of the extensive litigation involving First Amendment activities at Los Angeles International Airport, has never opened the Central Terminal Area at Los Angeles International Airport to First Amendment activities; and

WHEREAS, in the prudent management of Los Angeles International Airport and in order to avoid congestion and interference with the promotion and accommodation of air commerce and air navigation and uses incidental thereto and in order to protect passengers in the Central Terminal Area from unwanted or disruptive intrusions, the Board of Airport Commissioners herein de-

termines that the Central Terminal Area at Los Angeles International Airport is not open to individuals or entities engaging in First Amendment activities; and

WHEREAS, if any entity and/or individual seeks to engage in First Amendment activities in the vicinity of the Central Terminal Area, those activities must be conducted only on the sidewalks in front of the ticketing buildings and in such a manner so as not to interfere with other persons; and

NOW, THEREFORE, BE IT RESOLVED by the Board of Airport Commissioners that the Central Terminal Area at Los Angeles International Airport is not open for First Amendment activities by any individual and/or entity;

BE IT FURTHER RESOLVED that the Central Terminal Area at Los Angeles International Airport is only to be used for the promotion and accommodation of air commerce and air navigation or uses incidental thereto unless the Board of Airport Commissioners makes the appropriate findings pursuant to Charter Section 238.8 that a portion of said area is not currently required for the promotion or accommodation of air navigation or uses incidental thereto; and

BE IT FURTHER RESOLVED that after the effective date of this Resolution, if any individual and/or entity seeks to engage in First Amendment activities within the Central Terminal Area at Los Angeles International Airport, said individual and/or entity shall be deemed to be acting in contravention of the stated policy of the Board of Airport Commissioners in reference to the uses permitted within the Central Terminal Area at Los Angeles International Airport; and

BE IT FURTHER RESOLVED that if any individual or entity engages in First Amendment activities within the Central Terminal Area at Los Angeles International Airport, the City Attorney of the City of Los Angeles is directed to institute appropriate litigation against such individual and/or entity to ensure compliance with this Policy statement of the Board of Airport Commissioners; and

BE IT FURTHER RESOLVED if any entity or individual seeks to engage in First Amendment activities in the vicinity of the Central Terminal Area, those activities must be conducted only on the sidewalks in front of the ticketing buildings and in such a manner so as to not interfere with other persons; and

BE IT FURTHER RESOLVED that Department management is directed to monitor the conduct of any First Amendment activities on the sidewalks in front of the ticketing buildings and report periodically to the Board regarding such activities in order for the Board to ascertain whether any restrictions should be implemented concerning said activities; and

BE IT FURTHER RESOLVED that this action, a general policy procedure, is exempt from the requirements of the California Environmental Quality Act as provided by Article III, Section 2.n. of the Los Angeles City CEQA Guidelines.

I hereby certify that the foregoing is a true and correct copy of Resolution No. 13787 adopted by the Board of Airport Commissioners at a special meeting held Wednesday, July 13, 1983.

/s/ Elaine E. Staniec

Elaine E. Staniec—Secretary

BOARD OF AIRPORT COMMISSIONERS