SNYDER'S OF HANOVER,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

National Labor Relations
Board, Petitioner,

v.

Snyder's of Hanover, Inc. Respondent.

No. 01–2702, 01–3101.

United States Court of Appeals,
Third Circuit.

Argued March 8, 2002.

Filed June 24, 2002.

Jay R. Fries, Esquire (Argued), Paul M. Lusky, Esquire, Kruchko & Fries, Baltimore, MD, Counsel for Snyder's of Hanover, Inc.

Arthur F. Rosenfeld, Esquire, General Counsel, John E. Higgins, Jr., Esquire, Deputy General Counsel, John H. Ferguson, Esquire, Associate General Counsel, Aileen A. Armstrong, Esquire, Deputy Associate General Counsel, Frederick C. Havard, Esquire, Supervisory Attorney, Jeffrey M. Hirsch, Esquire (Argued), Attorney, National Labor Relations Board, Washington, DC, Counsel for National Labor Relations Board.

· Laurence M. Goodman, Esquire (Argued), Willig, Williams & Davidson, Phila., PA, Counsel for United Food and Commercial Workers Union, Local 1776—Intervenor.

Before BECKER, Chief Judge, ALITO and RENDELL, Circuit Judges.

### OPINION OF THE COURT

BECKER, Chief Judge.

Snyder's of Hanover, Inc., petitions for review of an order of the National Labor Relations Board ("the NLRB" or "the Board") holding that Snyder's violated Section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), by committing three unfair labor practices: (1) prohibiting non-employee representatives of the United Food and Commercial Workers International Union, Local 1776, AFL–CIO, CLC ("the Union"), from distributing literature in a public right-of-way on the company's York County, Pennsylvania, premises; (2) calling the police in an attempt to remove the Union organizers for trespassing; and (3) engaging in unlawful surveillance of the Union's organizing activities. The NLRB has cross-petitioned for enforcement of this order.

The surveillance issue is straightforward, and concluding that the Board's decision on that issue is supported by substantial evidence, we will enforce that aspect of its order and deny the cross-petition for review. The other two issues intersect with an area of Pennsylvania property law that is less than pellucid and that the parties have succeeded in confusing further. While the issues are thus somewhat muddled, as will appear, we side with Snyder's on those issues and grant its petition for review (and hence deny enforcement).

### I.

The relevant facts are set out in the decision of the Administrative Law Judge ("ALJ"), whose factual findings were adopted by the Board. We in turn accept the ALJ's findings as "supported by substantial evidence on the record considered as a whole," NLRA 10(e), 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 485–87, 71 S.Ct. 456, 95 L.Ed. 456 (1951), which we present in abridged form:

At 2:30 p.m. on the afternoon of October 1, [1998,] five union representatives arrived at the entrance to the Company's facilities, on State Route 116 (York Street or SR 116) to distribute union handbills to employees, as they entered or exited during a shift change.... The Company's plant lies a little more than 225 feet off of SR 116. A paved two-lane driveway, 34.5 feet wide, connects the plant to the highway. The Company's employees use this driveway going to and from their work at its plant....

[O]n October 1, there was a right-of-way, running from the middle of SR 116 to a line running tangent to one utility pole near the driveway and a short distance behind the other utility poles located near the edge of the road.

The five union representatives ... prepared to distribute handbills to company employees as they entered or exited the driveway at 3 p.m. The handbill encouraged company employees to select the Union as their representative for purposes of collective bargaining....

[T]he five union representatives did not venture inside the utility poles, but remained in the right-of-way ... [and] hand[ed] out union leaflets to incoming and exiting autos, at the top of the driveway.

At about 2:45 p.m. Company Vice Presidents John Bartman and Pat McInerney received word, while at a meeting at the plant, that there were people trespassing on company property and handing out leaflets.... The two company officials left the meeting to observe the asserted trespassing ... [and]

walked up the left side of the driveway, toward [two of the] Union Representatives [namely, Patricia Berger and Pierre Joanis]....

. . . .

... McInerney asked the union representatives if there were any company employees with them. The union representatives said no. McInerney said that the union representatives were trespassing and directed them to leave.... The union representatives remained adamant in their refusal to leave and insisted that they were not trespassing. Joanis warned McInerney that he and Bartman were engaging in surveillance.

Bartman announced that he would call the police ... [and] walked back to the company building to call the police. McInerney remained in the vicinity of Berger and Joanis arguing with them. The union representative claimed that they were standing in the right-of-way and accused McInerney of surveillance. At this time, cars were leaving the plant.... [Berger] warned [McInerney] that the Union would file an unfair labor practice charge ....

McInerney retreated down the driveway as Berger was handing union literature to departing cars during the shift change. He stood, looking into car windows and greeting people in the cars by name. In a few minutes, Bartman joined McInerney along the side of the driveway. The two moved a bit further down the driveway and continued to wave at the passing cars as the shifts changed. They also called out to the people in the cars by name. At the same time, Berger was handing to the passing employees the Union's handbills. [Snyder's plant engineer Dennis] Tavares also stood along the side of the driveway, waving at passing cars and addressing their occupants by name.

. . . .

[Penn Township Police Officer Guy] Hettinger testified that when he arrived at Snyder's, he observed the five union representatives standing at the entrance to Snyder's driveway, where the pavement of SR 116 and the driveway meet.... According to Hettinger's testimony, [Bartman and McInerney] complained that the five union people were trespassing on the Company's property and ... requested that the officer ask the five to leave....

The police officer testified that he told Patricia Berger and her colleagues of the Company's complaint that they were trespassing and also asked the nature of their activity. Hettinger testified that the union representatives told him that they were handing out union literature ... [and] that they had a right to be in the right-of-way of SR 116, which extended 16 feet from the yellow line in the middle of the road.... [Hettinger] told the union representatives that he did not know what a full right-of-way was in that area and that he would have to check on it.

Officer Hettinger ... went to his police cruiser and contacted York County's assistant district attorney, Tom Kelley .... Kelley advised him that [the Union representatives had a right to remain in the right-of-way so long as they were peaceful and did not impede the flow of traffic.]

[Hettinger] returned to Bartman and McInerney and told them of Kelley's remarks....

[Hettinger also] reported his conversation to the five union representatives ... [and then] departed from the site of their handbilling .... [T]he union representatives left the site [shortly thereafter.]

*Snyder's of Hanover, Inc.*, 334 N.L.R.B. No. 21 (May 30, 2001), at 3–5 (quoting Decision of ALJ).

We have jurisdiction over Snyder's' petition for review of the Board's order pursuant to Section 10(f) of the NLRA, 29 U.S.C. § 160(f), and jurisdiction over the Board's cross-petition to enforce its order pursuant to Section 10(e) of the NLRA, 29 U.S.C. § 160(e). Our review of the NLRB's legal analysis is "plenary," although because of the Board's special competence in the field of labor relations, we give its interpretations of the NLRA "special deference." *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir.2001).

## II.

■ In general, an employer has no obligation to allow the distribution of union literature by non-employees on its property. This "right of employers to exclude union organizers from their private property emanates from state common law." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 217 n. 21, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994). An employer seeking to justify its exclusion of non-employee organizers before the Board must, therefore, demonstrate that "at the time it expelled the union representatives," it had a property interest under state law "which entitled it to exclude individuals from the property." *Indio Grocery Outlet*, 323 N.L.R.B. 1138, 1141 (1997) (internal quotation marks and citations omitted), *enforced sub nom. NLRB v. Calkins*, 187 F.3d 1080 (9th Cir. 1999).

The Board concluded that Snyder's had no right to exclude the Union organizers from the right-of-way on its property because "under Pennsylvania law, handbilling on a public right-of-way is permissible if it is not coercive, intimidating or violent." *Snyder's* 334 N.L.R.B. No. 21, at 2. The

Board noted that under Pennsylvania law, the scope of the right-of-way in Snyder's' property is determined by municipal law. *See id.* at 1, 2 n. 4. Because, according to the Board, Snyder's "produced no evidence as to the scope of the public easement," — i.e., no evidence that Penn Township did not allow union handbilling in its public rights-of-way— "it was unable to establish that the Union's handbilling was outside the scope of that easement and that therefore [it] was entitled to exclude the union representatives from the public right-of-way." *Id.* at 2. In seeking enforcement, the NLRB's General Counsel has echoed the Board's decision's view of Pennsylvania law, stating in his brief that, "if the ... township did not authorize union handbilling in its public rights-of-way, the Company would be permitted to exclude such activity under Pennsylvania law, thereby avoiding liability under Section 8(a)(1). The Company, however, presented no evidence regarding [the township's] authorization of use for its public rights-of-way."

Pennsylvania law on the right of a municipality to control handbilling within public rights-of-way is checkered, especially when viewed through the lens of constitutional concerns. It is not clear to us whether Pennsylvania law or the First Amendment would permit a municipality to prohibit the distribution of leaflets in public rights-of-way. *See 46 S. 52nd St. Corp. v. Manlin*, 398 Pa. 304, 313, 157 A.2d 381 (1960) (quoting *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.")); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575–

76, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (recognizing that union handbilling may be entitled to First Amendment protection).

The issue is complicated by the fact that, although both parties concede that the area in question—the edge of the driveway to the Snyder's facility—is part of the public right-of-way, a driveway to a private facility is not necessarily the type of public area, such as a street, a park, or a sidewalk, that First Amendment jurisprudence considers to have been "immemorially" used "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague*, 307 U.S. at 515, 59 S.Ct. 954. Indeed, as Snyder's points out, Pennsylvania law has historically recognized that the scope of a public right-of-way may vary depending on context, *see Manlin*, 398 Pa. at 312, 157 A.2d 381 ("While the easement acquired by the public in country roads is an easement of passage only, this is not true in Pennsylvania with respect to the public right in the streets of a city."), a proposition with which the General Counsel for the Board, through his submission that the scope of a public right-of-way depends upon municipal law, appears to agree.

However, this case was not presented to us as a constitutional case, so we need not decide it that way. And although we are doubtful as to the accuracy of the characterizations of Pennsylvania law in the Board's decision and the General Counsel's brief, we will proceed from the legal premise embraced by the General Counsel that if Penn Township did not authorize union handbilling in its public rights-of-way, Snyder's "would be permitted to exclude such activity under Pennsylvania law, thereby avoiding liability under Section 8(a)(1)." Our review of the Penn Township ordinances indicates to us that the township has *not* expressly authorized union handbilling—or, for that matter, any other form of expression that could be understood to include handbilling—within its public rights-of-way. Consequently, in light of the General Counsel's critical concession that the municipality's lack of authorization for union handbilling exonerates Snyder's from liability under Section 8(a)(1), we are constrained to disagree with the Board's decision, and conclude that Snyder's had a right under Pennsylvania law—as it is presented to us by the parties—to exclude the organizers from its property, even if the organizers were stationed in a public right-of-way.

As we read it, the Board's decision to the contrary rested in large part on what it perceived as the failure of Snyder's to "produce[ ] . . . evidence as to the scope of the public easement" (or what the General Counsel referred to as Snyder's failure to present "evidence regarding [the township's] authorization of use for its public rights-of-way"). The municipality's authorization or non-authorization of handbilling by public ordinance is a *legal* issue, however, and not an issue of fact for which Snyder's bore the burden of proof under *Indio Grocery*. Indeed, in *Indio Grocery*, the Board specifically noted that in examining whether the employer had the right to exclude the union organizers from its property, "we look to the *law* that created and defined the [employer's] property interest . . . ." 323 N.L.R.B. at 1141 (emphasis added). Consequently, even if Snyder's did not demonstrate in its hearings before the ALJ and the Board that Penn Township's ordinances do not allow for handbilling, it is a legal issue over which we have plenary review, and the "substantial evidence" standard is therefore inapposite.[1]

---

1. We acknowledge that the General Counsel's position has some logical appeal. It is well-settled, after all, that "foreign law is treated as a fact that must be proven by the parties".

The General Counsel also argues that Snyder's did not present any documentary evidence before the ALJ or the Board demonstrating that it owned the property on which the Union organizers were standing. Consequently, the General Counsel contends, Snyder's has failed to satisfy its obligation under *Indio Grocery* to "establish that it had ... an interest which entitled it to exclude individuals from the property." 323 N.L.R.B. at 1141. We find this argument unconvincing, for even assuming that Snyder's failed to present any documentary evidence of ownership in the administrative proceedings, the Board's opinion never mentioned this supposed lack of documentary evidence as a basis for its decision. We therefore consider that the Board understood that Snyder's had title to the property extending to the middle of the road.[2]

Because we conclude that under Pennsylvania law, as represented to us by the parties, Snyder's had the right to exclude the organizers from the right-of-way on its property, we will grant the petition for review, and deny enforcement of the Board's order with respect to the first unfair labor practice, i.e., the charge that Snyder's violat Section 8(a)(1) of the

NLRA in its attempts to prohibit Union representatives from distributing handbills on its premises. As a direct consequence of this holding, we will also grant the petition for review, and deny enforcement of the Board's order with respect to the second unfair labor practice: Snyder's' calling the police in an attempt to remove the Union organizers for trespassing. Because Snyder's had a right to exclude the organizers, it was entitled to rely on municipal law enforcement officials to enforce this right, and, therefore, committed no unfair labor practice in this respect.

## III.

■ The ALJ found that the actions of the Snyder's managers in waving to cars and calling out the names of employees exiting the facility while the Union was distributing leaflets amounted to unlawful surveillance. Without any additional discussion of the issue, the Board affirmed.

"[A]n employer's mere observation of open, public union activity on or near its property does not constitute unlawful surveillance." *Hoschton Garment Co.*, 279 N.L.R.B. 565, 567 (1986). However, when management's observation is not just "ca-

---

*Abdille v. Ashcroft*, 242 F.3d 477, 489 n.10 (3d Cir.2001). This is so because American courts are presumed to have expertise only in American law. By analogy, one could argue that the NLRB, as an agency with a speciality in labor law only, ought to treat municipal law, an area in which it has no expertise, as an issue of fact that must be proven by the parties. The logic of this argument, however, is belied by the Board's own practice. Because issues of labor law are intricately tied to issues of state law, as demonstrated by the present case, the Board routinely plies its hand at interpreting state law, an area of law in which it has no expertise, and does not require parties to "prove" state law as a issue of fact. By extension, therefore, the law of municipality, which is a creation of a state, need not be "proven" to the Board as an issue of fact. This is not to say, however, that

Snyder's would not have been well-served to have raised these points of municipal law in its proceedings before the ALJ and the Board.

2. Moreover, the area at issue in this case is a portion of the driveway to Snyder's' facility, not the area between the driveway and the center of the road. It is therefore unnecessary for Snyder's to prove, as the General Counsel contends it must, that its property extends to the center of SR 116. Notwithstanding the irrelevance of this issue, we note that under Pennsylvania law it is well-stated that "ordinarily the title to property abutting on a public highway extends to the center of the highway." *Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers*, 353 Pa. 446, 455, 46 A.2d 16 (1946).

sual in nature," but rather amounts to a "deliberate attempt to interfere with the legitimate union activity of employees," a finding of illegal surveillance is warranted. *Brown Transp. Corp.*, 294 N.L.R.B. 969, 971 (1989); *see also U.S. Steel Corp. v. NLRB*, 682 F.2d 98, 101 (3d Cir.1982) (concluding that a finding of illegal surveillance is warranted when the circumstances of "the employer's conduct may reasonably tend to coerce or intimidate employees" in the exercise of their rights under the NLRA) (internal quotation marks omitted).

In *Brown Transport*, the Board enumerated a number of factors to be considered in determining whether management's observation is coercive in nature:

> These [factors] include the duration of the observation, the frequency and timing of the observation, the proximity of the observer to the union activity being conducted, the likelihood or actuality of trespassory actions by nonemployees engaged in the union activity, and the reasonableness of any perception on the part of the employer of any safety risks to employees or customers associated with the conduct of the union activity. Additional factors include the existence of demonstrated union animus on the part of the employer, the commission of other acts to interfere with the activity being conducted, and the employer observer's departure from customary or normal practice represented by his presence in the immediate vicinity of the union activity. Although each of the foregoing factors are significant, in the final analysis, all the circumstances surrounding the observation must be considered and evaluated.

294 N.L.R.B. at 971–72.

The ALJ's (and, in turn, the Board's) decision with respect to the unfair labor practice of surveillance appears to have been based largely on the testimony of Union organizer Berger, who stated that McInerney and Bartman "were standing ... down the tree line with their eyes open looking into cars, making hand gestures similar to a wave .... [T]hey were calling people by name, and giving general greetings to that sort." Since there was no evidence that this was standard or even occasional practice, the clear implication of this testimony, and the one that the ALJ and the Board appear to have accepted, is that management's actions were intended to let departing employees know that they were being watched to see if they accepted the Union's literature. As the ALJ observed, "I find that the Company's conduct in this regard was likely to discourage its employees from taking the Union's literature." *Snyder*'s, 334 N.L.R.B. No. 21, at 5 (quoting ALJ).

While we have some reservations about the failure of the ALJ and the Board to engage in a thorough application of the *Brown Transport* factors to the facts at hand, we nevertheless will sustain the Board's charge of unlawful surveillance. Although McInerney's, Bartman's, and Taveras's antics in waving to cars and calling out employees' names might appear to have been more awkward than threatening, their actions may well have deterred employees driving out of the factory's parking lot—particularly those whose names were called out—from accepting Union literature. Moreover, while Snyder's contends that McInerney, Bartman, and Taveras were concerned only with directing traffic and trying to cool the tempers of employees waiting in the long line of cars attempting to exit the parking lot, the ALJ's findings, which we consider supported by substantial evidence on the record, contradict Snyder's' benign characterization of the events.[3]

---

**3.** The proper standard for analyzing a charge    of surveillance is not whether the employer's

We therefore will enforce the Board's order with respect to the third unfair labor practice—unlawful surveillance—and deny Snyder's' petition for review as to this portion of the order.[4]

### IV.

For the foregoing reasons, we will grant Snyder's its petition for review of the Board's order (and deny the Board's cross-petition to enforce its order) as to alleged unfair labor practices (1) and (2), which charged Snyder's with violating the NLRA by prohibiting Union organizers from leafleting on its premises and calling the police in an attempt to remove them. We will deny Snyder's its petition for review (and grant the Board its cross-petition to enforce the order) only with respect to the charge of unlawful surveillance.

conduct is "likely to discourage" employees from engaging in protected activity, as the ALJ phrased it, but rather whether the employer's conduct "may reasonably tend to coerce or intimidate employees" in the exercise of their rights under the NLRA. *U.S. Steel*, 682 F.2d at 101; *see also* NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1) (making it an unfair labor practice for the employer "to interfere with, restrain, or coerce employees in the exercise of [their] rights"). The semantic difference between the two formulations is not self-evident, as they seem to be functionally similar or at least overlapping. Despite the ALJ's imprecise statement of the appropriate standard, we are satisfied, for the reasons given in the text, that the facts on the record support a finding that management's actions not only "likely discouraged" the employees of Snyder's from accepting the Union's literature, but also "reasonably tended to coerce or intimidate" Snyder's employees into not accepting the literature.

4. Snyder's also submits that its action were lawful because they were justified by the type of legitimate "trespassory concerns" recognized in *Brown Transport*. N.L.R.B. at 971. We disagree. While concern about possible trespassing by Union organizers may have been one factor animating management's actions, the ALJ and Board found that intimidating employees from accepting Union literature was an independent motive for the waving at and calling out to employees. Management's legitimate concern about trespassing does not absolve it of liability for consciously intimidating employees.